Filed 12/5/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)           S221852
      v. )
)      Ct.App. 2/5 B248316
PAUL MACABEO, )
)      Los Angeles County
      Defendant and Appellant. )   Super. Ct. No. YA084963
_____)

In *People v. Diaz* (2011) 51 Cal.4th 84 (*Diaz*), we held that, incident to a custodial arrest, police may search through data on a defendant's cellular phone without obtaining a warrant. The United States Supreme Court subsequently held to the contrary in *Riley v. California* (2014) 573 U.S. __ [134 S.Ct. 2473] (*Riley*). We conclude the warrantless search of defendant Paul Macabeo's phone would not have been proper even under our decision in *Diaz*, and a reasonably well-trained officer would have so known. Under these circumstances, the search violated the Fourth Amendment and the good faith exception to the exclusionary rule does not apply. We reverse the Court of Appeal's contrary judgment.

1

# I. FACTS AND PROCEDURE[1]

Detective Hayes and Officer Raymond of the Torrance Police Department were on routine patrol at 1:40 a.m. in a dark, residential neighborhood. When they saw defendant on a bicycle 20 feet ahead of them, there were few, if any, cars on the street. Defendant was not riding erratically, nor did he appear to be trying to evade them. Following with their headlights off for a distance of 50 to 75 feet, they saw him approach an intersection and roll through a stop sign, an infraction under Vehicle Code section 22450. The officers activated their overhead lights and stopped him.

Hayes initially spoke to defendant as he stood astride his bicycle. He asked defendant's name, where he was coming from and where he was going, whether he was on probation, for what offense, when he would be discharged, when he had last been arrested, and the name of his probation officer. No mention was made of the traffic infraction. Defendant answered all the questions without objection. His statements about his probationary status were somewhat confused. He initially said that he was on probation for possession of a controlled substance. When asked when he would be discharged from probation, he replied he was not sure, then reported his case had already been dismissed and he had no probation officer. The officers did not check to see if he was actually on probation, or whether any probation he might have been on included a search condition.

Hayes told defendant to walk toward the police car, put his hands up, and spread his feet. Defendant told the officers he had nothing illegal on his person. Hayes then asked if defendant had "any problem with me taking stuff out of your

---

[1]     The facts set out are based on the testimony given in connection with the defense motion to suppress and the transcript of a recording made during Mr. Macabeo's detention.

pockets," and defendant said "go ahead." Hayes removed a number of items, including defendant's phone. Hayes continued the questioning, asking when defendant had last used drugs, how he had ingested them, whether he possessed any needles, or had any outstanding warrants or unpaid parking tickets. Hayes asked who he lived with, whether he was working, how he supported himself, and what else he had ever been arrested for. Defendant was then told to sit down on the curb with his ankles crossed. Hayes told him that he was going to check "that you're being honest with me tonight," and asked where he had gotten the bike. Told the bike belonged to defendant's girlfriend, Hayes asked for the girlfriend's name and address.

Hayes directed defendant to take his shoes off one at a time and hand each over to him. Finally, after what the transcript described as a "long silence," defendant was told to put his hands on his head. Defendant asked twice if he was being arrested. Hayes replied, "I'll explain everything in a second. Do not stand up; you don't want to do that," whereupon the recording ends.

At the suppression hearing, Hayes characterized the interrogation as "just basic questions that I usually ask on a stop." He said that before asking to empty Mr. Macabeo's pockets, he had conducted a patdown search because defendant was acting "fidgety." He did not testify that the patdown revealed anything suspicious. After taking defendant's phone, Hayes gave it to Officer Raymond. Defendant was never asked for permission to activate the phone or examine its contents. After five to 10 minutes, Raymond told Hayes that he had found no suspicious text messages on defendant's phone, but that the picture folder contained images of underaged girls. Defendant was then arrested. The parties stipulated that possession of the photos was a violation of Penal Code section 311.11, subdivision (a).

3

Hayes repeatedly testified that he based his decision to search Mr. Macabeo on defendant's probationary status and on his belief that defendant's consent to remove items from his pockets constituted consent to examine the contents of the seized phone. Hayes admitted that after defendant was arrested, he checked the computer in his patrol car and learned that defendant had not been on probation for several months.

At the preliminary hearing, defendant moved to suppress the evidence found on his phone, arguing the search resulted from an unduly prolonged and unjustified detention. The trial court denied the motion, accepting the prosecutor's argument that because defendant *could have been* arrested for failing to stop at a stop sign, he was lawfully searched incident to arrest, justifying the phone search under the existing authority of *Diaz, supra,* 51 Cal.4th 84.

The Court of Appeal affirmed. Although it acknowledged that *Diaz*'s reasoning was subsequently repudiated in *Riley, supra,* 573 U.S. __ [134 S.Ct. 2473], the court concluded the good faith exception applied because *Diaz* was controlling law at the time and officers could reasonably rely on it to justify the search.

## II. DISCUSSION

### A. Search Incident to Arrest

"In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." (*People v. Troyer* (2011) 51 Cal.4th 599, 605; see *Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223.) " ' "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." ' "

4

(*People v. Suff* (2014) 58 Cal.4th 1013, 1053; see *People v. Tully* (2012) 54 Cal.4th 952, 979.)

"The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 365.) " '[T]he ultimate touchstone of the Fourth Amendment is "reasonableness." ' [Citation.] Our cases have determined that '[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.' " (*Riley*, *supra*, 573 U.S. at p. __ [134 S.Ct. at p. 2482], quoting *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 653.) "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." (*Riley*, at p. __ [134 S.Ct. at p. 2482].) The burden is on the People to establish an exception applies. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 455; *People v. Schmitz* (2012) 55 Cal.4th 909, 933.)

One such exception is a search incident to lawful arrest. In *United States v. Robinson* (1973) 414 U.S. 218, 224 (*Robinson*), the high court noted the exception is well settled and "no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee." (*Id.* at p. 225.) *Robinson* rejected the argument that a search incident to arrest must be justified on a case-by-case basis: "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the

5

case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." (*Id*. at p. 235.) *Robinson* concluded that, "[h]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct." (*Id*. at p. 236.)

*United States v. Edwards* (1974) 415 U.S. 800 (*Edwards*) held police could seize the defendant's clothing and conduct tests for evidence incident to an arrest that had occurred 10 hours earlier. *Edwards* noted officers were authorized to seize the defendant's clothing immediately upon arrest, but they delayed because "it was late at night; no substitute clothing was then available." (*Id*. at p. 805.) *Edwards* reasoned: "This was no more than taking from respondent the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." (*Ibid*.)

A search incident to arrest "has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." (*Edwards, supra,* 415 U.S. at pp. 802-803.) It is the fact of the arrest that justifies the search. An officer need not have particularized cause to believe an arrestee is actually armed or possesses contraband in order to search him. (See *Gustafson v. Florida* (1973) 414 U.S. 260, 266; *Robinson, supra,* 414 U.S. at p. 236.)

The exception has its limits, however. In *United States v. Chadwick* (1977) 433 U.S. 1, the court held that, without a warrant, officers could not search a 200-

6

pound footlocker the defendants were transporting at the time of their arrest. *Chadwick* reasoned the usual justifications for searches incident to arrest did not apply once officers have taken an arrestee's property away from him and into their exclusive control because "there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence." (*Id*. at p. 15.) Accordingly, a search of that property could not be justified as incident to the arrest. Similarly, *Chimel v. California* (1969) 395 U.S. 752, 768 concluded that a search of an entire house incident to an arrest occurring inside "went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him."

In *Diaz*, we applied the high court's precedents to conclude that officers could conduct a warrantless search of the defendant's phone, which had been taken from him when he was arrested 90 minutes earlier. *Diaz* held that because the phone "was immediately associated with defendant's person, [the officer] was 'entitled to inspect' its contents without a warrant . . . whether or not an exigency existed." (*Diaz, supra,* 51 Cal.4th at p. 93.)

In *Riley*, the high court concluded differently: "[W]e generally determine whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " (*Riley, supra,* 573 U.S. at p. __ [134 S.Ct. at p. 2484].) Applying this balancing test, *Riley* observed that the ordinary justifications for searches incident to arrest are to secure weapons, prevent escape, and preserve evidence of crime. These apply with less force in the context of cell phone data. With respect to officer safety, "[o]nce an officer has secured a phone and eliminated any potential physical threats . . . data on the phone can endanger no one." (*Id*. at p. __ [134 S.Ct. at p. 2485].) While phone data might reveal that

7

"confederates of the arrestee are headed to the scene" (*ibid.*), such a consideration "represent[s] a broadening of *Chimel*'s concern that an *arrestee himself* might grab a weapon and use it against an officer 'to resist arrest or effect his escape' " (*id.* at p. __ [134 S.Ct. at p. 2486]).  Regarding preservation of evidence, *Riley* noted the possibility that data might be remotely erased or automatically encrypted turns on the actions of third parties or functions of a phone's security features.  (*Ibid.*)  The *Riley* court concluded there was little reason to believe that either erasure or encryption is common and suggested police could prevent both by shutting the phone off or placing it "in an enclosure that isolates the phone from radio waves." (*Id.* at p. __ [134 S.Ct. at p. 2487].)

Riley contrasted the government's interests with the heightened privacy interests that people have in their cell phone data.  Likening these phones to "minicomputers" (*Riley, supra,* 573 U.S. at p. __ [134 S.Ct. at p. 2489]), *Riley* noted both the volume of sensitive data they contain and the pervasiveness of cell phone usage.  *Riley* also observed that cell phone data was "also qualitatively different" (*id.* at p. __ [134 S.Ct. at p. 2490]) from physical records.  It could include information, like location data or Internet browsing history, that would "typically expose to the government far *more* than the most exhaustive search of a house."  (*Id.* at p. __ [134 S.Ct. at p. 2491].)  The court was careful to note that in any specific case where officer safety or evidence might be compromised, the exigent circumstances exception would still apply.  (*Id.* at p. __ [134 S.Ct. at p. 2494].)  *Riley* concluded:  "Modern cell phones are not just another technological convenience.  With all they contain and all they may reveal, they hold for many Americans 'the privacies of life,' [citation]. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.  Our answer to the question of what police must do before searching a cell phone seized incident

to an arrest is accordingly simple—get a warrant." (*Id*. at p. __ [134 S.Ct. at pp. 2494-2495].)

*Riley* concluded that, in the case of cell phone data, the limitation of *Chadwick* should apply. (*Riley, supra,* 573 U.S. at p. __ [134 S.Ct. at p. 2489].) Just as the contents of a seized footlocker posed no threat to officers who had secured it, and there was no danger its contents could be destroyed, Riley's cell phone data posed no danger and reasonable steps could be taken to prevent evidence destruction. Accordingly, because the factors that support the search-incident exception were significantly reduced, in light of the heightened privacy interest involved, the general warrant requirement applied.

The warrantless examination of the contents of defendant's cell phone here ran afoul of *Riley*. Even before *Riley*, however, the search here would not have qualified as a proper search incident to arrest under *Diaz*. The People acknowledge that the present case is distinguishable from *Diaz* where we upheld the search as incident to an *actual* custodial arrest. Diaz was properly taken into custody and brought to the sheriff's station, where his cell phone was taken and eventually searched. (*Diaz, supra,* 51 Cal.4th at p. 89.) We applied the reasoning of *Robinson*, *Edwards*, and *Chadwick*, all of which involved searches incident to an actual arrest. Indeed, *Robinson* and *Edwards* emphasized that the authority to search *derived from* taking a defendant into custody. "It is the fact of the lawful arrest which establishes the authority to search" (*Robinson, supra,* 414 U.S. at p. 235), and such searches have "traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained" (*Edwards, supra,* 415 U.S. at pp. 802-803). As a second point of distinction, the *Diaz* arrest was supported by probable cause independent of any information subsequently discovered on the defendant's phone.

9

Unlike *Diaz*, Mr. Macabeo was not under arrest when officers searched his phone. Despite this fact, the People urge that the officers *could have* arrested defendant for failing to stop his bicycle at a stop sign, and then searched his phone incident to that arrest in reliance on *Diaz.* For this proposition, the People rely on *Rawlings v. Kentucky* (1980) 448 U.S. 98 (*Rawlings*). There, officers entered a home to serve an arrest warrant. Although the subject of the warrant was absent, there were several occupants in the residence, including Rawlings and his companion Vanessa Cox. While inside, the officers smelled marijuana smoke and saw some marijuana seeds. They detained the occupants 45 minutes while a search warrant was obtained. Based on the warrant, officers asked Cox to empty the contents of her purse. She did so, revealing 1,800 LSD tablets and vials of other drugs. Cox told Rawlings to " 'take what was his' " and he admitted the drugs belonged to him. Officers then searched Rawlings and found $4,500 in cash and a knife. He was subsequently arrested. (*Id*. at pp. 100-101.)

As relevant here, the court assumed the initial detention of Rawlings and the other occupants was improper. Even so, it concluded his admission to owning the drugs was not the product of that illegal detention. Instead, because of various factors, including that all occupants had been read their *Miranda* rights before the search of Cox's purse, his admissions were "acts of free will, unaffected by any illegality in the initial detention." (*Rawlings, supra,* 448 U.S. at p. 110.) The court went on to uphold the search of Rawlings's person because his statements provided probable cause for his arrest. It observed, without further elaboration, "Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." (*Id.* at p. 111.) The court took care to note that the "fruits of the search of petitioner's person were, of course, not necessary to support probable cause to arrest petitioner." (*Id*. at p. 111, fn. 6.)

10

The People read far too much into the *Rawlings* comment about the order in which discovery of probable cause is made and the effectuation of a formal arrest takes place. In *Rawlings*, the court concluded there was probable cause to arrest based on his voluntary statements made before any search of his person. (*Rawlings, supra,* 448 U.S. at p. 111.) *Rawlings* merely established that when an arrest is supported by probable cause, after-acquired evidence need not be suppressed because an otherwise properly supported arrest was subsequently made formal.

Furthermore, *Rawlings* is not the only high court case to speak in this area. Indeed, the People's expansive understanding of *Rawlings*, that probable cause to arrest will always justify a search incident so long as an arrest follows, is inconsistent with *Chimel* and *Chadwick*. It is also in tension with the reasoning in *Knowles v. Iowa* (1998) 525 U.S. 113 (*Knowles*). There, the defendant was stopped for speeding. Iowa law authorized police either to take into custody anyone committing a traffic violation or, alternatively, to issue a citation. The officer chose to issue Knowles a citation in lieu of arrest. He then searched Knowles's car, found drugs, and arrested him. (*Id*. at p. 114.) In upholding the search, the Iowa Supreme Court relied upon an Iowa statute providing that "the issuance of a citation in lieu of an arrest 'does not affect the officer's authority to conduct an otherwise lawful search,' " interpreting this statute to allow a search incident to citation. (*Id*. at p. 115.)

The high court reversed, finding the lack of a custodial arrest significant. It reasoned the two primary justifications for incident searches, disarming an arrestee and preserving evidence, did not justify the search of Knowles. (*Knowles, supra,* 525 U.S. at p. 116.) *Knowles* opined that "[t]he threat to officer safety from issuing a traffic citation . . . is a good deal less than in the case of a custodial arrest" (*id*. at p. 117) and "while the concern for officer safety in this context may

11

justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search" (*ibid*.). Similarly with respect to evidence preservation, *Knowles* reasoned that "[o]nce Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained. No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car." (*Id*. at p. 118.)

*Knowles* was distinguished in *Virginia v. Moore* (2008) 553 U.S. 164 (*Moore*). Officers arrested Moore for driving with a suspended license, searched him, and found drugs. However, Virginia only authorized issuance of a citation, not an arrest, for driving with a suspended license. (*Id*. at p. 167.) The Virginia Supreme Court held that because state law did not authorize an arrest, the officers could not rely on that arrest to justify their search. (*Id*. at p. 168.)

The high court reversed. It concluded that, state law notwithstanding, both the arrest and search were permissible under federal Fourth Amendment jurisprudence. "[W]e have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." (*Moore, supra,* 553 U.S. at p. 171.) This constitutional principle applies even "when a State chooses to protect privacy beyond the level that the Fourth Amendment requires." (*Ibid*.; see *id*. at p. 174.)

With respect to the search, *Moore* distinguished *Knowles, supra,* 525 U.S. 113: "The interests justifying search are present whenever an officer makes an arrest. A search enables officers to safeguard evidence, and, most critically, to ensure their safety during 'the extended exposure which follows the taking of a suspect into custody and transporting him to the police station.' [Citation.]

12

Officers issuing citations do not face the same danger, and we therefore held in *Knowles* . . . that they do not have the same authority to search.  We cannot agree with the Virginia Supreme Court that *Knowles* controls here.  The state officers *arrested* Moore, and therefore faced the risks that are 'an adequate basis for treating all custodial arrests alike for purposes of search justification.' " (*Moore, supra,* 553 U.S. at p. 177.)

These cases, taken together, stand for the following principles.  When a custodial arrest is made, and that arrest is supported by independent probable cause, a search incident to that custodial arrest may be permitted, even though the formalities of the arrest follow the search.  (*Rawlings*.)  There is no exception for a search incident to citation.  (*Knowles*.)  If an actual arrest takes place, a search incident to that arrest is allowed if it is supported by federal Fourth Amendment jurisprudence, more restrictive state law notwithstanding.  (*Moore*.)  Even the search-incident exception may be limited when attendant circumstances show the arrestee had no potential to put an officer in jeopardy, to escape, or to destroy evidence.  (*Chimel*, *Chadwick*, *Riley*.)

These authorities make clear that *Rawlings* does *not* stand for the broad proposition that probable cause to arrest will always justify a search incident as long as an arrest follows.  Otherwise, *Knowles* would have been decided differently.  The officer in *Knowles* had probable cause to arrest for a traffic infraction, but elected not to do so.  (*Knowles, supra,* 525 U.S. at p. 114.)  Once it was clear that an arrest was *not* going to take place, the justification for a search incident to arrest was no longer operative.

This case is analogous to *Knowles*, and the high court's rationales for not applying the incident search exception have equal force here.  *Knowles* reasoned the threat to officer safety was "a good deal less than in the case of a custodial arrest," and no further evidence of speeding would be uncovered by a search.

13

(*Knowles, supra,* 525 U.S. at p. 117.)  Similarly here, any potential threat to officer safety was similar to that in *Knowles*.  Further, these officers were no more likely to find additional evidence of his failure to stop at a stop sign by searching him than the officers in *Knowles* were likely to find evidence of speeding.  Our case is more like *Knowles* than *Moore*.  Even though, as in *Moore*, defendant could have been arrested under federal law, he was not in fact taken into custody.  Indeed, the People acknowledged during oral argument that state law *precluded* officers from arresting Mr. Macabeo under these circumstances.  He was detained for failing to stop at a stop sign, an infraction, and, except under circumstances not present here, could only have been cited and released.  (See Veh. Code §§ 22450, subd. (a), 40000.1, 42001, subd. (a); *People v. McKay* (2002) 27 Cal.4th 601, 620.)  Nor does it appear that there are objective indicia to suggest, as the People's argument presumes, that the officers would have arrested defendant in violation of state law.[2]

So, the posture of our case is this.  First, the phone search was conducted without a warrant and was improper unless justified by an exception to the warrant requirement.  Second, defendant was not on probation, so the search could not be based on that nonexistent status.  Third, the People concede that defendant did not consent to the search of his phone.  Fourth, the search did not qualify as incident to

---

[2]    *Devenpeck v. Alford* (2004) 543 U.S. 146, cited by the People, is inapposite.  That case involved the validity of an actual arrest, with the high court concluding that an arrest will not be rendered unconstitutional if there is probable cause to arrest for an offense, simply because an officer at the time of the arrest identifies a different offense unsupported by probable cause and not " 'closely related' " to the offense for which there *was* probable cause.  (*Id.* at pp. 152-156.)  Although *Devenpeck* makes clear that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause" (*id.* at p. 153), nothing in our decision suggests otherwise.

14

arrest under the Fourth Amendment.  Fifth, under *Riley*, even if defendant had been properly arrested, a warrant was required to search the phone.  The only way to avoid suppression of the data is if the good faith exception to the exclusionary rule applies.

### B.  The Good Faith Exception

Exclusion of evidence due to a Fourth Amendment violation is not automatic.  As the high court stated:  "The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced.  To supplement the bare text, this Court created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation."  (*Davis v. United States* (2011) 564 U.S. 229, 231-232 (*Davis*).)  "The rule . . . operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.' "  (*United States v. Leon* (1984) 468 U.S. 897, 906 (*Leon*).)

The high court has recognized that the deterrent purpose of the rule is not served by excluding evidence when an officer reasonably acts in objective good faith.  *Leon* involved an officer's reliance on a signed search warrant later found deficient.  The court held the exclusionary rule should not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even if the warrant was subsequently invalidated.  (*Leon, supra,* 468 U.S. at p. 920.)  *Leon* balanced the "substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights" with its potential to deter future police misconduct.  (*Id*. at p. 907.)  Application of the exclusionary rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence."  (*Davis,*

15

*supra,* 564 U.S. at p. 237.) " 'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " (*Leon*, at p. 919, quoting *United States v. Peltier* (1975) 422 U.S. 531, 542.) *Leon* reasoned that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' [Citation.] Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (*Leon*, at p. 921.)

In *Illinois v. Krull* (1987) 480 U.S. 340, the Supreme Court applied the good faith exception where officers conducted a search based on a statute authorizing warrantless administrative searches. The statute was later declared unconstitutional. *Krull* reasoned that excluding evidence under such circumstances "would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." (*Id*. at pp. 349-350.)

The high court in *Davis* applied similar reasoning to conclude: "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis, supra,* 564 U.S. at p. 232.) Davis

16

was arrested after a routine traffic stop. He and another occupant were handcuffed and placed in a patrol vehicle. Police then searched the car and found contraband. (*Id*. at p. 235.) *Davis* observed that "[n]umerous courts read [*New York v. Belton* (1981) 453 U.S. 454] to authorize automobile searches incident to arrests of recent occupants, regardless of whether the arrestee in any particular case was within reaching distance of the vehicle at the time of the search. [Citation.] Even after the arrestee had stepped out of the vehicle and had been subdued by police, the prevailing understanding was that *Belton* still authorized a substantially contemporaneous search of the automobile's passenger compartment." (*Id*. at p. 233.) That understanding changed after *Arizona v. Gant* (2009) 556 U.S. 332, 335, which held that "*Belton* does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle."

The search in *Davis* came after *Belton* but before *Gant*. At the time of the search, *Belton* was understood "to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest." (*Davis, supra,* 564 U.S. at p. 239.) "The search incident to Davis' arrest in this case followed . . . precedent to the letter." (*Ibid*.) *Davis* held the exclusionary rule did not apply. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' [Citation.] The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence. [Citation.] Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement. [Citation.] The police acted in strict compliance with binding precedent, and their behavior

17

was not wrongful.  Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." (*Id*. at p. 240.)

Beginning with *Leon*, the court made clear that the good faith reliance doctrine was derived from the policies underlying the exclusionary rule itself.  It also explained that the doctrine is objective, fact-based, and limited. "Accordingly, our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.  In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered." (*Leon, supra,* 468 U.S. at pp. 922-923, fn. 23.)  While concluding that the officers could reasonably rely on a facially valid warrant that was later overturned, *Leon* noted that will not always be the case:  "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, [citation], and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." (*Id*. at pp. 922-923, fns. omitted.)  *Leon* noted that an officer could not reasonably rely on a warrant based on an affidavit " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " or if the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." (*Id*. at p. 923.)

The high court has also applied the good faith exception when officers have acted in reasonable reliance on information that subsequently is determined to be inaccurate.  These cases, too, emphasize the deterrence rationale.  In *Arizona v. Evans* (1995) 514 U.S. 1 (*Evans*), an officer arrested and searched the defendant based on information in a computer database reflecting an outstanding arrest warrant.  The information had not been updated to show the warrant had

18

previously been quashed.  In concluding the exclusionary rule should not apply, *Evans* identified and applied three factors:  (1) "the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees" (*id.* at p. 14), (2) there was "no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion" (*id*. at pp. 14-15), and (3) exclusion of evidence would not "have a significant effect on court employees responsible for informing the police that a warrant has been quashed" because they are not "adjuncts to the law enforcement team" and "have no stake in the outcome of particular criminal prosecutions" (*id*. at p. 15).  Further, because the mistake did not originate with police, *Evans* observed that "application of the exclusionary rule also could not be expected to alter the behavior of the arresting officer" under the circumstances.  (*Ibid*.)  *Evans* endorsed the trial court's assessment that the officer would have been " 'derelict in his duty if he failed to arrest,' " observing that the type of clerical error at issue occurred once " 'every three or four years.' "  (*Ibid*.)  As such, "[t]here is no indication that the arresting officer was not acting objectively reasonably when he relied upon the police computer record."  (*Id*. at pp. 15-16.)

 *Herring v. United States* (2009) 555 U.S. 135 (*Herring*) applied *Evans*'s reasoning to a similar computer database error made by police employees in a neighboring jurisdiction.  *Herring* initially observed that the officers who arrested and searched the defendant "did nothing improper" and "the error was noticed so quickly because Coffee County requested a faxed confirmation of the warrant." (*Herring, supra,* 555 U.S. at p. 140.)  *Herring* noted *Leon*'s principle that the deterrence benefit of evidentiary exclusion when a search warrant was reasonably relied upon would be marginal.  It then concluded "[t]he same is true when evidence is obtained in objectively reasonable reliance on a subsequently recalled

19

warrant." (*Herring*, at p. 146.) The calculus might differ, *Herring* reasoned, if police "have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future arrests." (*Ibid*.) Further, "where systemic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system." (*Ibid*.) However, under the circumstances before them, *Herring* reasoned there was "no evidence that errors in Dale County's system are routine or widespread." (Id. at p. 147.) The officer testified "he had never had reason to question information about a Dale County warrant," and the police clerks involved "could remember no similar miscommunication ever happening on their watch." (*Ibid*.) Thus, *Herring* applied the deterrence rationale of *Evans* by emphasizing that excluding evidence would not deter future mistakes where the searching officer had no reason to question the apparent authority granted to him by the information in the computer database.

The People attempt to fit the present search into this paradigm, arguing that the search was authorized by *Diaz, supra,* 51 Cal.4th 84. However, as we have explained, *Diaz* involved an actual custodial arrest. Our analysis rested on United States Supreme Court authorities that all involved custodial arrests. While the People cite *Rawlings, supra,* 448 U.S. 98, for the proposition that probable cause to arrest alone will always justify a search incident to arrest, other high court authority demonstrates that a reasonably well-trained officer would know this search would not qualify as one incident to arrest.

Such an officer would know the general rule that a search must be authorized by warrant. Such an officer would also know that the search-incident *exception* to the general rule is based on the need to protect officer safety, preserve evidence, or prevent escape. These concerns come into play when a suspect is to be arrested. But here, a reasonably well-trained officer would have known that state law prohibited an arrest in these circumstances, and there is no objective

20

indication that the officers were going to arrest defendant in defiance of that state law. At the time of this search, officers did not issue a citation, which, without more, would have precluded an incident search under *Knowles, supra,* 525 U.S. 113. Nor did they arrest defendant, which would have authorized an incident search under *Moore, supra,* 553 U.S. 164.

*People v. Gomez* (2004) 117 Cal.App.4th 531, relied upon by the People, does not alter this conclusion. Officers there were watching a house they suspected was used for drug trafficking. Police saw Gomez arrive at the house, load a vehicle with several large boxes, and leave. Officers pulled Gomez over for a failing to wear his seatbelt, and detained him "for well over an hour" before requesting a canine unit, which discovered drugs. (*Gomez, supra,* 117 Cal.App.4th at p. 537.) The *Gomez* court agreed with the defendant that the record did not "show the requisite diligence to justify the prolonged detention." (*Id.* at p. 538.) Instead, holding Gomez for over an hour "amount[ed] to a de facto arrest that must be supported by probable cause to be constitutionally valid." (*Ibid.*) *Gomez* expressly concluded that the de facto arrest was legally justified by sufficient facts, known *before* the search incident to it. Here, by contrast, the People do not assert that a de facto arrest occurred.

Applying the exclusionary rule here is consistent with the deterrence rationale of the high court cases. In adopting an objective good faith standard, *Leon* stated: " 'Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment.' [Citations.] The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits." (*Leon, supra,* 468 U.S. at pp. 919-920, fn. 20.) As *Evans* observed, "the exclusionary rule was historically designed as a means of deterring police misconduct." (*Evans, supra,*

21

514 U.S. at p. 14.)  Under *Herring*, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system," and "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  (*Herring, supra,* 555 U.S. at p. 144.)

This case does not involve the type of negligence at issue in *Evans* and *Herring*, where employees failed to update a computer database before an officer relied on the information therein.  Indeed, the People's argument that suppressing the evidence would not serve the deterrence rationale is little more than a restatement of their contention that *Diaz* and *Gomez* specifically authorized the search.  We have rejected that claim.

Further, this case is unlike *Davis,* which reasoned that "[a]bout all that exclusion would deter in this case is conscientious police work.  Responsible law-enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." (*Davis, supra,* 564 U.S. at p. 241.)  Because appellate authority specifically authorized the search there, *Davis* concluded the "deterrent effect of exclusion in such a case can only be to discourage the officer from ' "do[ing] his duty." ' " (*Ibid*.)  Whatever the outer limit of *Davis* may be, this case lies outside it.  In light of our conclusion that a reasonably well-trained officer would have known that the search here did not qualify as one incident to arrest, exclusion of evidence would serve a deterrent purpose by ensuring officers have a "reasonable knowledge of what the law prohibits" (*Leon, supra,* 468 U.S. at pp. 919-920, fn. 20), and discouraging unjustified conduct.

The circumstances here are in stark contrast to *People v. Robinson* (2010) 47 Cal.4th 1104.  That case involved "mistakes that led to the unlawful collection

22

of defendant's blood . . . made because correctional staff was under pressure to immediately implement a newly enacted law that was complex and confusing . . . ." (*Id*. at p. 1126.)  We observed that employees had "conscientiously tried to follow" the requirements of the law, and the lab had initiated its own verification process to ensure only properly collected samples were included in the database.  (*Id*. at pp. 1128-1129.)  Evidence also refuted any deliberate policy of collecting samples from nonqualifying prisoners as such conduct risked "the draconian sanction . . . [of] expulsion from the national crime-solving index and removal of the CODIS software from a noncompliant laboratory." (*Id*. at p. 1127.)  In this context, we observed the correctional employees acted negligently, but their conduct was not the result of " 'systemic error or reckless disregard of constitutional requirements' " and was not so culpable that deterrence "is worth the price paid by the justice system." (*Id*. at p. 1129.)  We further concluded that no deterrent purpose would be served by exclusion because a subsequent statutory amendment expanded and simplified what constituted a qualifying offense, thus "eliminat[ing] the likelihood that biological specimens will be mistakenly collected or analyzed." (Id. at p. 1129, fn. 23.)

It was the duty of correctional employees in *People v. Robinson* to implement a complex and confusing new statutory scheme with little guidance. Though that implementation was not perfect, our application of the good faith exception was a recognition that exclusion of evidence would only serve to punish their attempt to properly perform their duty.  By contrast, the search here was not the result of negligence, and the People do not contend otherwise.  Nor did it result from any pressure to apply a newly enacted statutory scheme that was confusing and complex.  The officers' conduct, including the search, was deliberate. Exclusion of evidence will serve to deter future similar behavior.

### III. CONCLUSION

The judgment of the Court of Appeal is reversed.  The case is remanded to that court.  It is directed to return the matter to the trial court with instructions to suppress the data seized from Mr. Macabeo's cell phone.  Further proceedings with regard to the plea entered by Mr. Macabeo should proceed in accordance with this judgment.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

24

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Macabeo

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 229 Cal.App.4th 486
**Rehearing Granted**

_____

**Opinion No.** S221852
**Date Filed:** December 5, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Mark S. Arnold

_____

**Counsel:**

Bird & Bird, Karen Hunter Bird; Samuelson Law, Technology & Public Policy Clinic, Catherine Crump and Charles D. Weisselberg for Defendant and Appellant.

Peter Bibring, Catherine Wagner, Michael T. Risher and David Blair-Loy for ACLU Foundation of Southern California, ACLU Foundation of Northern California and ACLU Foundation of San Diego and Imperial Counties as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Edward C. Dumont, State Solicitor General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Michael R. Johnsen and Victoria B. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

California Appellate Law Group, Myron Moskovitz and Ben Feuer as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Charles D. Weisselberg
Samuelson Law, Technology & Public Policy Clinic
University of California, Berkeley School of Law
Berkeley, CA  94720-7200
(510) 643-4800

Victoria B. Wilson
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2357