Filed 8/30/22  P. v. Alatorre CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JAIME RODRIGUEZ ALATORRE,<br><br>        Defendant and Appellant. | F082106<br><br>(Kern Super. Ct. No. BF180492A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Maral Injejikian, Judge.  (Retired Judge of the Los Angeles Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

J. Meera Malik, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Jaime Rodriguez Alatorre (appellant) pleaded no contest to discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3, subd. (a))[1], felon in possession of a firearm (§ 29800, subd. (a)(1)), and felon in possession of ammunition (§ 30305, subd. (a)(1)). The trial court sentenced appellant to two years in state prison.

On appeal, appellant challenges the trial court's denial of his section 1538.5 motion to suppress evidence. We conclude the initial search of appellant's residence was a valid protective sweep supported by reasonable suspicion, and we affirm.

## BACKGROUND

Appellant filed a motion to suppress evidence pursuant to section 1538.5 challenging the officers' initial search of his residence, which led to the discovery of a firearm. Appellant also moved to quash the subsequent search warrant for his residence as based on tainted evidence.

The following facts are derived from the testimony of three police officers at the hearing on appellant's motion to suppress, the search warrant for appellant's residence, and the police body camera footage offered into evidence by appellant.

On March 22, 2020, around 2:00 a.m., the "Shot Spotter" system in the City of Bakersfield detected several gunshots at an address on Owens Street. The location of the gunshots was relayed to patrol officers through the computers in their patrol vehicles. The first officer reached the Owens Street address within two to three minutes of the Shot Spotter notification. There, he found a single-family residence, later determined to be appellant's residence, surrounded in front by an approximately four feet tall wrought iron fence with a locked gate. There was a car parked inside of the fenced area and another car parked on the street in front of the residence. The officer observed eight expended cartridge casings on the ground approximately 10 to 15 feet inside of the fence in the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

driveway adjacent to the residence. When he arrived, he did not see anyone near the residence or in the area.

Appellant's residence is visible in the police body camera footage admitted into evidence. The front of the residence sits close to the sidewalk and the front door faces toward the street. The wrought iron fence runs along the sidewalk and encloses a small area directly in front of the residence and a narrow driveway immediately to the left of the residence.

After additional officers arrived on scene, they initiated a "surrender callout" over a loudspeaker directing occupants of appellant's residence to exit through the front door. Officers also activated the red and blue lights on their patrol vehicles and had a police K-9 bark to alert the occupants to their presence. After approximately five to seven minutes, appellant exited through the front door of the residence, but refused to come out of the locked fenced area in front. Appellant stated he would not come out without a warrant, and that his kids were asleep inside. An officer told appellant he had to come out because a firearm had been discharged in his yard and explained that they located expended casings in his yard and that Shot Spotter detected gunshots at his house. Appellant repeatedly insisted nothing happened in his yard, and while something might have happened on the street in front of his yard, his gate is locked. He also claimed the only other people in his house were his wife and two children, and that he did not want the police to disturb them. When officers threatened to arrest appellant for obstructing their investigation and told him he was being given a lawful command to come out of the fenced area, he responded he would go to jail if he had to.

After several more minutes of back and forth between appellant and the officers, appellant's wife exited the residence and told appellant to cooperate, stating he was "going to get [her] kids shot up." Appellant relented and opened the gate, and officers detained him. Appellant's wife and two children were also escorted off the property. When asked if anyone else was inside the residence, she stated no. Officers pat searched

3.

appellant but did not find a firearm on his person. A firearm was not found in the possession of the wife or children.

Officers then elected to conduct a protective sweep of the residence for an armed subject. Given Shot Spotter's detection of gunshots at the residence, the location of the cartridge casings within the locked area of the yard, the presence of multiple parked cars near the residence, their arrival to the scene within minutes of the gunshots, and the fact that no firearm had been recovered, they believed an armed suspect may still have been inside. They also did not believe appellant's claim that no one else was inside. One officer testified that in his experience performing over a dozen callouts, subjects often lie about who is inside of a residence.

Prior to executing the sweep, the officers performed an additional surrender callout to anyone remaining inside. They then entered and conducted a systematic sweep of all places where an armed subject might be found. No additional subjects were located during the sweep. However, when an officer entered a walk-in closet, he observed a firearm in plain view on a shelf. The officer did not touch the firearm. Instead, upon completion of the sweep, the officers drafted a search warrant and included the discovery of the firearm in the affidavit. After the search warrant was executed and the firearm was recovered, appellant was placed under arrest.

At the conclusion of the suppression hearing, the trial court denied the motion, reasoning: "I didn't find any fault with anything that they did. I thought the protective safety sweep was totally warranted. I think they would have been remiss in their duties had they not conducted it. And everything else kind of fell into place once the gun was seen."

## DISCUSSION

### I.    Standard of Review

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied,

4.

where supported by substantial evidence.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.) "[W]e must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.) " 'In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd*, at p. 719.

" 'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.' " (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212; Cal. Const., art. I, § 24.)

## II. The Protective Sweep of Appellant's Residence was Supported by Reasonable Suspicion

### A. *Applicable Legal Principles*

The federal Constitution's Fourth Amendment, made applicable to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. (*People v. Celis* (2004) 33 Cal.4th 667, 676 (*Celis*).) " '[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' [Citation.] Thus, 'searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.] 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.' " (*People v. Troyer* (2011) 51 Cal.4th 599, 602.)

A protective sweep is one such exception. In *Maryland v. Buie* (1990) 494 U.S. 325, 327, the United States Supreme Court set forth the legal standard for conducting a protective sweep, a "quick and limited search of premises … conducted to protect the safety of police officers or others." *Buie* drew on *Terry v. Ohio* (1968) 392 U.S. 1, which authorized "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' … 'that he is dealing

5.

with an armed and dangerous individual.' " (*Buie* at p. 332.) *Buie* extended this logic to the protective sweep of a residence, holding there exists "an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." (*Id.* at p. 333.) Accordingly, *Buie* adopted a similar standard for protective sweeps, requiring a showing of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to" law enforcement personnel. (*Id.* at p. 334.)

Although *Buie* involved a protective sweep following an arrest inside of the home, subsequent cases have clarified that its holding is not so limited. A protective sweep may be conducted "in conjunction with a suspect's detention," (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1206, fn. omitted (*Werner*)) during a probation search, (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 864) or by an officer "left behind to secure the premises while a warrant to search those premises is obtained" (*U.S. v. Taylor* (6th Cir. 2001) 248 F.3d 506, 513). (See also *U.S. v. Rodriguez* (2016) (8th Cir. 2016) 834 F.3d 937, 942 [Protective sweep applicable to "non-arrest situation"]; *Leaf v. Shelnutt* (7th Cir. 2005) 400 F.3d 1070, 1087–1088; *U.S. v. Gould* (5th Cir. 2004) 364 F.3d 578, 584 abrogated on another ground by *Kentucky v. King* (2011) 563 U.S. 452.) Further, in appropriate circumstances officers may enter a residence solely to conduct a protective sweep to ensure the safety of officers just outside. (*Werner, supra,* 207 Cal.App.4th at p. 1206; *People v. Maier* (1991) 226 Cal.App.3d 1670, 1675.) " '[A]n arrest taking place just outside a home may pose an equally serious threat to the arresting officers' as one conducted inside the house." (*Celis, supra*, 33 Cal.4th at p. 679, italics omitted.) This is because "[a]n accomplice on another floor is surely no more dangerous than one on the other side of a window, or a door." (*People v. Maier,* at p. 1675.)

6.

Regardless of the context, the requisite showing to effectuate a protective sweep remains the same: "A protective sweep [of a residence] can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (*Celis, supra,* 33 Cal.4th at p. 678.) While this standard requires more than " 'a mere "inchoate and unparticularized suspicion or 'hunch,' " ' " probable cause is not required. (*Ibid*.) Rather, the officers need only " 'articulable facts' considered together with the rational inferences drawn from those facts, that would warrant a reasonably prudent officer to entertain a reasonable suspicion that the area to be swept harbors a person posing a danger to officer safety." (*Id.* at pp. 679–680.)

In determining whether the reasonable suspicion standard had been met, "courts must evaluate the ' "totality of the circumstances" ' on a case-by-case basis to see whether the officer has ' "a particularized and objective basis" ' for his or her suspicion." (*People v. Ledesma*, *supra*, 106 Cal.App.4th at p. 863, quoting *United States v. Arvizu* (2002) 534 U.S. 266, 273.) "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " (*Arvizu,* at p. 273.) As such, the United States Supreme Court has "cautioned against restricting the range of facts considered in the calculus of reasonable suspicion," including the preclusion of "police reliance on facts consistent with an innocent as well as a guilty explanation." (*Ledesma*, at p. 863, citing *Arvizu*, at pp. 273–274.) "As *Arvizu* makes clear, the officer's training and experience can be critical in translating observations into a reasonable conclusion." (*Ledesma*, at p. 866.)

**B.**     *Analysis*

Applying the above standards set forth in *Buie* and its progeny, we conclude the protective sweep of appellant's residence was reasonable under the Fourth Amendment. The discharge of eight rounds in a residential area was compelling evidence of the commission of a dangerous felony – either assault with a semiautomatic firearm (§ 245,

subd. (b)) or discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a)). The evidence also overwhelmingly supported the inference that someone inside of the appellant's residence committed said felony minutes prior to the officers' arrival. The Shot Spotter system, which two officers testified in their experience is very accurate, placed the gunshots at appellant's residence. The expended cartridge casings were found within a secured area of the yard surrounded by a fence that would be difficult for even a nimble person to traverse. Moreover, an officer arrived on scene within minutes and observed no one near appellant's residence or leaving the area. Thus, it was unlikely that someone fired the gunshots from the locked portion of appellant's yard then fled the area.

Appellant's slow response to the surrender callouts suggested that he or someone in his residence was involved in the shooting. Appellant did not come outside for over five minutes despite callouts over a loudspeaker and a large police presence outside. His slow response was even more suspicious given that minutes before police arrived someone discharged eight rounds in his front yard. Considering how close the expended cartridge casings and the officers parked on the street were to appellant's house, his unusually slow response to eight gunshots and a significant police presence indicated some level of culpability. (Cf. *U.S. v. Ludwig* (10th Cir. 2011) 641 F.3d 1243, 1248 ["[A] driver's failure to stop his vehicle promptly is a factor that can contribute to reasonable suspicion of criminal activity"].)

Even more significant than appellant's slow response was his repeated insistence that nothing happened in his front yard despite obvious evidence to the contrary. This absurd, demonstrably false claim was further evidence of appellants consciousness that either he or someone in his residence was responsible for the gunshots. (See *People v. Williams* (2000) 79 Cal.App.4th 1157, 1167–1168 ["Deliberately false statements to the police about matters that are within an arrestee's knowledge and materially relate to his or her guilt or innocence have long been considered cogent evidence of a consciousness of guilt, for they suggest there is no honest explanation for incriminating

8.

circumstances"].)  While his stated interest in ensuring his family and children were not disturbed might be reasonable under different circumstances, here, one would expect the primary concern a father with two children to be the discharge of eight rounds within feet of his house.  Therefore, it appeared appellant was not being truthful with the officers and attempting to cover for himself or for someone else inside

Despite clear evidence that *someone* inside appellant's residence discharged the firearm, appellant claims that after he and his family exited the house, the officers had no articulable basis for believing someone else remained inside.  Specifically, appellant contends that after he and his wife told the officers no one else was inside, they had no reason to suspect the contrary.  We disagree.  Appellant's obviously untruthful statement that nothing happened outside of his house gave the officers ample reason not to believe him, and further, to suspect the opposite.  (See *People v. Troyer, supra,* 51 Cal.4th at p. 613 ["The possibility that the unaccounted-for male victim (or other victims) could have been in the locked upstairs bedroom was further enhanced by [an occupant's] inconsistent and evasive responses to Sergeant Albright's inquiries as to whether anyone was inside the residence"].)  While appellant's wife did not make similar false statements, her association with appellant made her a "less-than-disinterested source," and it was reasonable for the officers not to believe her as well.  (See *Motley v. Parks* (9th Cir. 2005) 432 F.3d 1072, 1082, overruled on another ground by *U.S. v. King* (9th Cir. 2012) 687 F.3d 1189.)

After appellant and his family were removed from the residence and no gun was recovered, the officers reasonably concluded the firearm was still inside.  While the officers had reason to believe appellant was responsible for the shooting, he denied involvement and claimed nothing happened in his yard.  By denying that he, and by implication his family, were responsible for the shooting, appellant compelled the officers to consider the only possible alternative – that someone other than appellant was responsible for firing eight rounds in the fenced area of the house, and that person

9.

remained inside with the firearm. That possibility was supported by the fact that two cars were parked near the residence, including one on the street outside of the fenced area, suggesting the presence of a visitor. (See *People v. Ledesma*, *supra*, 106 Cal.App.4th at p. 866 ["[W]e conclude simply that the presence of two cars located directly in front of the residence created a reasonable suspicion that one or more individuals linked to those cars were at the residence"].) Moreover, appellant's suspicious behavior and absurd claim that nothing happened outside of his house, suggested that if he was not attempting to hide his own conduct, he was attempting to cover for someone else.

To complete their investigation and attempt to obtain a search warrant, the officers had to "freeze" the residence, which one officer explained requires officers to stand near any entry or exit point to make sure no subjects enter or leave. Without conducting a protective sweep, officers on scene would be vulnerable to an ambush by an armed subject, trapped in the house and surrounded by police. Thus, the protective sweep was reasonably necessary under the circumstances.

Appellant's reliance on other cases involving protective sweeps is unavailing. In *Celis*, officers detained the defendant and a coconspirator outside of the defendant's residence on suspicion of drugs trafficking, then entered the residence "to determine if there was anyone inside who might endanger their safety." (*Celis, supra,* 33 Cal.4th at p. 672.) In holding the protective sweep was not supported by reasonable suspicion, our high court explained the officers had no knowledge that anyone was inside of the residence, and there was no indication the defendant or his coconspirator were armed. (*Id.* at pp. 679–680.) Here, the officers had clear evidence that anyone inside of his residence had access to a firearm that had been discharged minutes prior and had reason to believe appellant was not being truthful when he claimed no one other than his immediate family members were inside.

Similarly, in *Werner,* officers received a report from a woman that her boyfriend, the defendant, had assaulted her hours earlier. (*Werner, supra,* 207 Cal.App.4th at

10.

p. 1201.) The officers then went to the defendant's residence, and after he exited through the front door, detained him handcuffs. (*Ibid.*) When the defendant asked his roommate to retrieve his shoes and keys from his room, an officer accompanied the roommate for " 'officer safety reasons.' " (*Ibid.*) The court held the protective sweep was not justified, noting the defendant was handcuffed outside, the alleged crime happened hours earlier, the roommate posed no apparent threat, there was no indication of criminal activity inside of the residence, and the officers did not have "any reason to doubt" the roommate's statement that no one else was inside. (*Id.* at p. 1207.) Additionally, the court rejected the notion that "the presence of weapons may be inferred merely by the nature of the suspected crime of domestic violence." (*Ibid.*) Here, the presence of weapons was more than hypothetical. The officers had strong evidence that the occupants of the residence posed a danger to their safety and had compelling reasons not to believe the occupants' assurances the house was empty. Although appellant and his family had been detained outside, the officers still had an articulable basis to believe an armed person may still have been inside of the house.

Considering the totality of the circumstances, our de novo review of the suppression hearing reveals the protective sweep of appellant's residence was supported by reasonable suspicion. We conclude, as did the trial court, the officers' belief an armed suspect may have remained inside of appellant's residence was reasonable under the circumstances. Accordingly, we conclude the trial court did not err in denying appellant's section 1538.5 motion to suppress.

## DISPOSITION

The judgment is affirmed.

POOCHIGIAN, ACTING P. J.

WE CONCUR:

DETJEN, J.

PEÑA, J.

12.