Filed 6/24/22  P. v. Lee CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br> PATRICK ELLIOT LEE, <br><br> Defendant and Appellant. | A158225, A159872 <br><br> (Contra Costa County <br> Super. Ct. No. 51806082) |

After a jury convicted Patrick Elliot Lee (Lee) of eight counts of insurance fraud under Penal Code section 550, subdivisions (a)(1) and (b)(1),[1] the trial court ordered him to pay restitution to the insurers he defrauded.  In these consolidated appeals, he seeks reversal of the judgment and the restitution order.  Lee argues his conviction was the product of a constitutionally deficient search warrant, an erroneously denied motion to recuse the prosecutor, prosecutorial misconduct, insufficient evidence as to two of the eight counts, and cumulative error.  As for restitution, Lee contends the trial court erred in ordering him to pay the attorney fees of an insurer who had previously signed a settlement and release as to Lee's

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

1

fraudulent claim. We find no reversible error and affirm both the judgment and the restitution order.

## BACKGROUND

### I.

### *The Investigation*

On February 10, 2015, San Pablo Police Officer Matthew Brown responded to the scene of a reported burglary, where Lee's wife told him she had returned home to find all the Lees' property missing. Lee subsequently filed a theft claim under his renter's insurance policy with Homesite Insurance (Homesite), telling the insurer that the allegedly stolen property exceeded $50,000 in value and that Lee had hired an attorney to assist him with the claim.

On March 12, 2015, Officer Brown called California Department of Insurance Detective Clint Herndon and told him the burglary reported by Lee's wife on February 10 involved "suspicious circumstances that he thought might involve an insurance claim." Herndon then met with Brown and Suzie Short, an investigator working for Homesite. After Brown and Short showed Herndon evidence they had gathered on their own, Herndon decided to open his own fraud investigation into Lee's theft claim.

In the course of his investigation, Herndon discovered that Lee had communicated with Officer Brown by e-mail from a Gmail account. Homesite's initial acknowledgement of Lee's theft claim had been sent to the same Gmail address (the Gmail address). When Lee rented a storage unit eight days before the reported burglary, he used the Gmail address. After he moved property out of that storage unit, he rented a second unit near his new home in Menlo Park, again using the Gmail address.

2

Detective Herndon's investigation also uncovered a car insurance claim Lee had made on October 9, 2014, under his policy with Progressive Insurance (Progressive). Pursuant to the terms of Lee's insurance policy, Progressive had paid $720 to provide Lee with a rental car after Lee claimed, on November 12, 2014, that he was taking his Porsche in for repairs. During the period in which the car insurance claim was being resolved, Lee used the Gmail address consistently in his correspondence with Progressive.

On June 16, 2015, Herndon sought a search warrant for Lee's Gmail "address for the date range November 12, 2014 through June 16, 2015" (the Gmail warrant). In the attached affidavit, Herndon summarizes as follows the factual basis for his suspicion that a search of the Gmail account would reveal evidence of insurance fraud:

(1) "the condo" from which Lee's property was reported stolen "was immaculately clean";

(2) "nearly every piece of property was taken . . . except for the high-end appliances that belonged to the property owner";

(3) "there was no evidence of forced entry";

(4) "Lee . . . had a storage unit in Emeryville from 2/2/15 to 2/21/15, which is a range of 8 days before and 11 days after the alleged theft report";

(5) "Lee rented a new storage unit . . . on 2/26/15 near his reported residence in Menlo Park";

(6) "Lee . . . signed a release of claims to settle [the] theft . . . claim" on May 19, 2015;

(7) "Lee moved his property out of . . . [s]torage on 5/20/15 and the manager reported seeing household goods in the back of Lee's car";

3

(8) "Lee initially reported over $100,000 in losses to Homesite. After he was notified that his case was being investigated, he initially agreed to a $10,000 payment and later settled for $18,000";

(9) "Lee's attorney claimed he had about $15,000 in fees into the case, leaving Lee with a net of about $3,000 to cover his alleged loss of over $100,000"; and

(10) "Lee has several prior questionable insurance claims, including the Progressive automobile claim in 2014 in which your affiant believes that Lee obtained payment from Progressive for a rental car under fraudulent and false pretenses."

Herndon supported this last assertion with specific facts elsewhere in the affidavit, writing that photographs taken in 2015—after Progressive had paid for Lee's rental car—depict scratch damage "consistent with the . . . October 2014 [claim]," leading Herndon to believe that the Porsche had never been taken in for repairs.

A Contra Costa County superior court judge signed the Gmail warrant on June 16, 2015. Evidence seized under the warrant ultimately led investigators to Aran Eversman, a longtime associate of Lee living in Cave Junction, Oregon. When police asked Eversman whether he had received any property from the Lees, he showed them several items, including a "couch set, a TV stand, a very distinctive coffee table made out of a Ferrari wheel, . . . a vacuum, a steam cleaner, and a bed." These items matched photographs of the items Lee had reported stolen in his Homesite insurance claim.

## II.

### *Criminal Proceedings*

#### A. Pre-Trial Proceedings

On December 17, 2015, Lee and his wife were charged by felony complaint with eight counts of insurance fraud under Penal Code section 550, subdivisions (a)(1) and (b)(1).  The final amended information charged nine counts, of which counts 1 through 7 concerned the Homesite claim and counts 8 through 9 concerned the 2014 Progressive claim.

On June 12, 2018, Lee filed a motion to suppress evidence under section 1538.5, arguing inter alia that the Gmail warrant was overbroad and unsupported by probable cause.  After several continuances, the motion was heard and denied on March 5, 2019.

Prior to trial, Lee also filed a motion to recuse the Contra Costa County District Attorney's Office, arguing that prosecutorial bias should be inferred from the circumstances surrounding the execution of a July 16, 2018 search warrant for Lee's yacht (the yacht warrant).  The statement of probable cause attached to the yacht warrant was an affidavit sworn by Contra Costa District Attorney's Office Senior Inspector John Garcia.  In the affidavit, Garcia relayed allegations that Lee had physically abused his wife and set aside $50,000 to hire a hitman to kill Greg Chiarella, the deputy district attorney prosecuting Lee's case.  The trial court denied the recusal motion on October 17, 2018.

#### B. Trial and Verdict

Jury trial commenced on October 31, 2018.  In their case-in-chief, the People examined Loan Craig, the Progressive claim representative who processed Lee's October 9, 2014 claim regarding the scratch damage to his Porsche.  Craig testified that Lee's insurance policy entitled him to a rental

car benefit while his Porsche was being repaired. Upon hearing from Lee that he was taking the Porsche to be repaired in Colorado, Craig authorized a $720 payment to provide Lee with a rental car for 18 days. When Craig was asked to view photographs of the Porsche taken after Lee's rental car had been returned, she testified that they depicted the same scratch damage that Lee supposedly had repaired.

The defense evidence as to the Progressive claim consisted of the testimony of both Lee and John May. The owner of an auto shop in Colorado, May testified that Lee's Porsche was brought to him in early November 2014. According to May, there was no time for him to repair the scratch damage after an initial wet-sanding proved unsuccessful. May kept no records as to the Porsche and charged no fee for the wet-sanding. For his part, Lee testified that a friend had driven the Porsche to May's shop at Lee's request.

The People cross-examined Lee about his finances. A commercial pilot, Lee moved from Colorado to California in 2014 to work for Air Methods, who led Lee to believe he would earn more money in California than he ultimately did. The prosecutor showed Lee a November 12, 2014, e-mail in which Lee complained about his compensation to management at Air Methods. Having referred to the e-mail, Lee testified that at the time he sent the e-mail, he had made $37,000 year-to-date, an income he described as "pretty pitiful." In argument, the prosecutor recounted Lee's financial problems, telling the jury that "money was tight," so the Lees "invented an insurance claim."

On December 10, 2018, the jury found both Lee and his wife guilty as charged.

### C. The Restitution Order

On December 20, 2019, the trial court ordered Lee to pay restitution to his victims. In addition to the money Lee owed Progressive, Lee was ordered

to pay Homesite $18,000 for the economic loss caused by Lee's fraudulent theft claim, as well as $64,280.03 in attorney fees. At the December 20, 2019 hearing, the trial court rejected Lee's argument that the terms of his earlier, March 2018 settlement with Homesite precluded the court from ordering Lee to pay attorney fees.

These appeals followed.

## DISCUSSION

The instant consolidated appeal challenges both Lee's conviction and the restitution order that followed. As to the judgment of conviction, Lee argues that it rested on five reversible errors: (1) the trial court's denial of Lee's motion to suppress the evidentiary fruits of the Gmail warrant; (2) the trial court's denial of Lee's motion to recuse the Contra Costa County District Attorney's Office; (3) prosecutorial misconduct; (4) insufficient evidence of any fraud perpetrated against Progressive; and (5) cumulative error. As to the restitution order, Lee contends that the terms of the civil settlement precluded the trial court from ordering restitution for Homesite's attorney fees and that a significant portion of those fees were neither "reasonable" nor "costs of collection" under section 1202.4, subdivision (f)(3)(H). We reject these arguments and affirm both the judgment and the restitution order.[2]

### I.

### *There Was No Error in the Trial Court's Denial of Lee's Motion to Suppress.*

Lee argues that the trial court erred in its March 5, 2019 denial of Lee's motion to suppress evidence seized under the search warrant for his Gmail

---

[2] Because Lee does not prevail on the merits, we do not reach the People's contention that Lee's arguments against the judgment were rendered moot on October 21, 2021, when Lee's case was terminated upon his successful completion of probation.

7

account.  According to Lee, that motion should have been granted because the affidavit attached to the search warrant failed to establish any "fair probability" that he had engaged in unlawful conduct and because the warrant was overbroad.  Neither argument persuades.

### A. The Search Warrant Affidavit Satisfied the "Probable Cause" Requirement.

Lee contends that the Gmail warrant was constitutionally deficient because it was unsupported by probable cause.  The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  "In reviewing a search conducted pursuant to a warrant, an appellate court inquires 'whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 161, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1040.)  "The magistrate's determination of probable cause is entitled to deferential review." (*Ibid*.)

Here, probable cause was established in abundance by an affidavit sworn by Detective Herndon, a California Department of Insurance detective, certified public accountant and certified fraud examiner.  In the affidavit, Herndon describes the origins and course of his investigation into the theft claim made by Lee against his renter's insurance policy with Homesite.  Herndon then recounts the facts underlying his suspicion that the theft claim was fraudulent.

The affidavit's assertions establish a timeline of Lee's conduct in the months surrounding the reported theft.  In October 2014, Lee filed one of "several prior questionable insurance claims," a "Progressive automobile" claim by which Lee "obtained payment . . . for a rental car."  Lee had received the rental car benefit "only because he claimed his" scratched Porsche "was

8

being fixed."  After the rental car had been returned, Lee's claim about fixing the Porsche was apparently contradicted by the observations of a peace officer who noted that the Porsche "had scratch damage all the way around the car."  Such damage was "consistent with the Progressive claim in October 2014," leading Detective Herndon to believe that "Lee did not have the [Porsche] repaired" at all and thus had received payment for the rental car under "fraudulent and false pretenses."  (Italics omitted.)

On February 2, 2015, Lee and his wife rented a storage unit.  Eight days later, on February 10, they reported the alleged property theft to the police and Homesite.  The condominium from which Lee's property had been removed "was . . . immaculately clean," "there was no evidence of forced entry," and "nearly every piece of property was taken . . . except for the high-end appliances that belonged to the property owner."  On February 21—11 days after the reported theft—Lee closed out the rented storage unit.  He rented a new storage unit five days later on February 26, "near his reported residence in Menlo Park," telling the storage facility manager that the unit would be used for "wheels."  On May 19, Lee and his wife settled their insurance claim with Homesite for $18,000.  The next day, Lee moved his property out of the Menlo Park storage unit.  As Lee removed his property, the storage facility manager saw "household and bedroom items," not wheels.

Detective Herndon's affidavit also highlights three facts related to the $18,000 settlement.  First, Lee had initially estimated his loss to be over $100,000.  Second, he only agreed to settle and settled for a relatively small amount "[a]fter he was notified that his case was being investigated."  And third, Lee's attorney claimed he was owed "about $15,000" for his work on the case, leaving Lee a balance of only "$3,000 to cover his alleged loss."

9

Thus, the affidavit provides more than " 'a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' " (*People v. Carrington*, *supra*, 47 Cal.4th at p. 161.) It is entirely reasonable to infer from the facts Detective Herndon relayed that Lee moved his property into storage, filed a theft claim with Homesite, and then removed the property from storage once Homesite had settled the claim and Lee believed the danger of any investigation had passed. In short, the affidavit establishes probable cause to believe that Lee committed insurance fraud.

Seeking to avoid this conclusion, Lee provides a series of innocent explanations for the factual assertions contained in Detective Herndon's affidavit. Such explanations, however, are irrelevant to the inquiry here: "In assessing the affidavit's facts it is possible to imagine '[s]ome innocent explanation. . . . But "[t]he possibility of an innocent explanation does not deprive the [magistrate] of the capacity to entertain a reasonable suspicion." ' " (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1784, quoting *People v. Kershaw* (1983) 147 Cal.App.3d 750, 759-760.)

For that reason, we conclude that the warrant to search Lee's Gmail account was supported by probable cause.

## B. The Trial Court Properly Denied Lee's Motion to Suppress, Regardless of Whether the Warrant Was Overbroad.

The second defect Lee ascribes to the Gmail warrant is overbreadth. " 'It is axiomatic that a warrant may not authorize a search broader than the facts supporting its issuance.' " (*People v. Nguyen* (2017) 12 Cal.App.5th 574, 581.) "Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. [Citation.] In considering whether a warrant is sufficiently particular, courts consider the purpose of the warrant, the nature of the items sought,

10

and 'the total circumstances surrounding the case.' [Citation.] A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense." (*People v. Eubanks* (2011) 53 Cal.4th 110, 133-134.)

Even where the scope of a warrant is overbroad, suppression of evidence is not a proper remedy if the search falls within the "good faith exception" to the exclusionary rule first articulated in *United States v. Leon* (1984) 468 U.S. 897 (*Leon*). Under *Leon*, evidence seized pursuant to an overbroad warrant will only be suppressed if "a reasonably well trained police officer would have concluded the warrant was so facially deficient that he or she, as executing officer, could not reasonably presume it to be valid." (*Bay v. Superior Court* (1992) 7 Cal.App.4th 1022, 1030.)

Here, Lee finds overbreadth in the Gmail warrant's purported authorization to search "all of [his] personal emails" for the time period under investigation, a scope Lee argues should have been limited only to "emails referring to the Homesite Insurance theft claim." However, Lee fails to cite any binding authority that supports his position. He discusses *In re Ricardo P.* (2019) 7 Cal.5th 1113 and *In re Alonzo M.* (2019) 40 Cal.App.5th 156, but both of these cases dealt with probationers subject to certain electronic search conditions, and the courts struck those conditions not because they were unconstitutionally overbroad, but because they were invalid under *People v. Lent* (1975) 15 Cal.3d 481.

As for the federal appellate cases upon which Lee relies, for the most part they involve warrants with more serious overbreadth problems than the ones alleged here. In *United States v. Kow* (9th Cir. 1995) 58 F.3d 423, 427, for example, the Ninth Circuit Court of Appeals determined that a warrant was overbroad where "[m]uch of the information in the affidavit relate[d] to

11

alleged acts of violence" with "no apparent connection to the business documents sought in the warrant." In contrast, the affidavit supporting the Gmail warrant focuses narrowly on Lee's two fraudulent insurance claims and shows how Lee used the Gmail address in connection with both. And unlike the warrant in *Kow*, whose authorization to seize seven years of tax returns was the only authorization "limited as to time," the Gmail warrant authorized the seizure of only seven months of materials. (See *id*. at p. 428.) Further, even where federal cases are more directly applicable than *Kow*, they "provide persuasive rather than binding authority." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1292.) Finally, we note that Lee does not discuss any case involving the application of the overbreadth doctrine to a search warrant for e-mails.[3]

Evidence will not be suppressed " 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' even if the warrant was subsequently invalidated." (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1220, quoting *Leon*, *supra*, 468 U.S. at p. 920.) Here, the Gmail warrant was supported by an affidavit establishing probable cause to believe that the Gmail address to be searched was itself an instrumentality of Lee's criminal conduct. The warrant's scope was limited to a six-month period encompassing Lee's two suspected

---

[3] In recent years, the Legislature has acted to remedy the apparent scarcity of such authority. Warrants like the Gmail warrant are now governed by the California Electronic Communications Privacy Act of 2016 (§ 1546 et seq. (CalECPA)). Section 1546.1, subdivision (d)(1), of that law provides that such warrants must "describe with particularity the information to be seized by specifying, as appropriate and reasonable, the time periods covered, the target individuals or accounts, the applications or services covered, and the types of information sought . . . ." Because the CalECPA does not apply retroactively, we do not discuss it further here. (Cf. *People v. Sandee* (2017) 15 Cal.App.5th 294, 305, fn. 7.)

fraudulent claims. And binding legal authority suggesting that the warrant is overbroad eludes even Lee's appellate counsel. Under such circumstances, it strains credulity to suggest that a "reasonably trained officer would have concluded that the warrant was so facially deficient that he or she, as executing officer, could not reasonably presume it to be valid." (*Bay v. Superior Court*, *supra*, 7 Cal.App.4th at p. 1030.)

Thus, because the seized evidence falls within the *Leon* exception to the exclusionary rule, the trial court properly denied Lee's motion to suppress the evidentiary fruits of the Gmail warrant.

## II.

### *The Trial Court Did Not Abuse Its Discretion in Denying Lee's Motion to Recuse the Contra Costa County District Attorney's Office.*

Lee argues that the trial court erred in its denial of Lee's motion to recuse the Contra Costa County District Attorney's Office. Section 1424, subdivision (a)(1) provides that such a motion "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." Thus, the " 'statute "articulates a two-part test: '(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?' " ' [Citation.] The defendant 'bear[s] the burden of demonstrating a genuine conflict; in the absence of any such conflict, a trial court should not interfere with the People's prerogative to select who is to represent them.' [Citation.] That burden is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office." (*People v. Trinh* (2014) 59 Cal.4th 216, 229.) We defer to the trial court's findings of fact if they are supported by substantial evidence and review its decision based on those facts under the deferential abuse of discretion standard. (*People v. Eubanks* (1996) 14 Cal.4th 580, 594.)

13

Lee's accusation of bias on the part of the Contra Costa District Attorney's Office rests on the following two factual claims: (1) that Greg Chiarella, the deputy district attorney who prosecuted Lee's case, "manufactured a pretext" for the July 16, 2018 yacht warrant; and (2) that the same prosecutor failed "to dispassionately exercise his prosecutorial discretion in plea bargaining."

The yacht warrant was issued based on evidence suggesting that Lee had physically abused his wife and was planning to have Chiarella killed. Lee argues that because the district attorney's office ultimately concluded there was insufficient evidence to merit filing charges based on the threats, the entire investigation into the threats was a ruse for harassing Lee. He contends the prosecuting attorney in the insurance fraud case, Chiarella, fabricated the threat accusation as part of a plot to have Lee arrested, have his yacht and electronics searched and have his wife interviewed without counsel, "all on the eve of trial, to shake up Lee and strengthen the prosecution's hand." As for Chiarella's purported failure to "dispassionately exercise his prosecutorial discretion in plea bargaining," Lee contends that if Chiarella was not so "personally and emotionally embroiled in this case," he would have agreed to a misdemeanor plea.

The problem with Lee's arguments on appeal is that they ignore entirely the trial court's findings and the evidence supporting them.

We begin with the trial court findings. The court concluded Lee had not met his burden of demonstrating any bias or conflict of interest. The court found, "there's nothing here before me that shows any type of bias, motive, or any other type of ill will towards either Mr. Lee or Ms. Lee that would require recusal of either the office or the individual attorney."

14

Substantial evidence supports the trial court's finding. The warrant affidavit sworn by Senior Investigator Garcia and his declaration in opposition to the recusal motion laid out the following facts. Garcia was contacted by Lieutenant Medina of the Homicide/Gang Unit of the district attorney's office and asked to assist in an investigation of potential death threats against a prosecutor assigned to a fraud case and his supervisor. Garcia spoke with Chiarella, who recounted a telephone call he had received from an FBI special agent about those threats. The targets of those threats, Chiarella and his supervising attorney, worked for the Special Operations Division, and Garcia had never worked for them, had no cases with them and did not work in their chain of command.

Crucially, it was Garcia, not Chiarella, who investigated the threats and worked with the FBI and the Alameda Police Department. Garcia spoke to the FBI agent who had first reported the threats and learned the FBI had been made aware of the threats by Christopher Coco, the boyfriend of Lee's wife. Coco had reported it to a close friend who was an FBI inspector. Joined by two senior FBI inspectors, Garcia met with Coco in person. In the recorded interview that followed, Coco confirmed that he was informed by Lee's wife that "Lee told her that there was a safe full of money . . . that could be used to hit or kill the prosecutor in his case rather than deal with it." According to Coco, Lee's wife "thought maybe [Lee] would be using" that money "to facilitate the hit." Coco also told Garcia and the FBI agents about multiple instances in which he saw injuries resulting from domestic violence Lee's wife said Lee had committed. After the interview, the FBI agents tried to convince Lee's wife to talk with them and to provide a statement, but she was frightened and refused. Garcia spoke with other witnesses who witnessed Lee's wife bleeding and heard from her that Lee had assaulted her

15

and taken away her cellphone and computer, and later that day Lee was arrested for domestic violence.

After the conclusion of Garcia's investigation into the threats, which led to a search warrant and seizure of cash and electronic devices, he submitted the investigation to the Felony Filing Deputy, who worked independently from the Special Ops Division and the Gang/Homicide Unit. That deputy advised him there was insufficient evidence to file charges based on the threats, and Garcia returned all property seized under the warrant to Lee.

The declarations allow no room for an inference that Chiarella "manufactured" the alleged threats to gain some advantage in the insurance fraud prosecution.[4] Rather, they provide substantial evidence supporting the trial court's findings that there was no bias or conflict of interest. The trial court thus acted well within its discretion when it denied Lee's motion.

---

[4] In support of his contention that Chiarella manufactured a pretext for the yacht warrant, Lee further argues that Chiarella "expressly linked his request for a search warrant to plea bargaining negotiations in the insurance [fraud] case, where Lee was attempting to have the case reduced to a misdemeanor." From this, Lee concludes that "Chiarella was not walled off from the [yacht] warrant incident" and that, "[o]n the contrary, he instigated it." This is, to put it charitably, creative speculation. Garcia's affidavit in support of the warrant does not support Lee's theory. Chiarella told Garcia that Lee "was a commercial pilot and that he was trying to get the charges reduced to a misdemeanor as he would lose his pilot's license if convicted of a felony." But this remark follows a discussion of the threats allegedly made by Lee and in context suggests only that Chiarella was informing Garcia of a possible motive for Lee's alleged "threats to harm if not kill" Chiarella, who was taking to trial a case Lee might have wanted desperately to settle. Nor do Garcia's affidavits provide any support for Lee's bald assertion that Chiarella was acting out of bias by declining to agree to a misdemeanor plea in the insurance fraud case.

## III.

### *Lee Has Failed to Preserve Any Claim of Prosecutorial Misconduct.*

Lee argues that the prosecutor engaged in misconduct by "eliciting testimony concerning [Lee's] financial condition, and then underscoring this testimony in his summation as a motive for crime." Indeed, "[u]nder the well-established rule, a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1076.) Here, the People cross-examined Lee about his income, which was lower than he expected around the time Lee filed the theft claim. Citing Lee's testimony in this regard, the People argued that "money was tight," so Lee "invented the insurance claim."

However, claims of prosecutorial misconduct are waived "[i]f the defendant fails to object to the asserted misconduct and does not request an instruction or admonition to lessen any possible prejudice . . . ." (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36, citing *People v. Ghent* (1987) 43 Cal.3d 739, 762.) Here, there was no such objection or request for an admonition, and for that reason, the issue is waived.

As for Lee's contention that his trial counsel did object to alleged misconduct, the record indicates otherwise. We find no objection in the request by Lee's counsel to approach the bench in order to view a late 2014 e-mail Lee wrote to his employer, in which Lee complains about his compensation. In fact, Lee's counsel made no objection while the People asked Lee nearly a dozen questions about his income. Only when the People asked Lee how he would "characterize the tone" of the e-mail did Lee's counsel object "to the substance of" the question, citing Evidence Code section

17

352, subdivision (a). Then, after Lee testified that he "wouldn't go that far" as to characterize the e-mail as "angry," Lee's counsel objected again, this time to the People's attempt to impeach Lee's testimony by reading the e-mail's text. In both cases, the questions to which Lee's counsel objected concerned Lee's feelings toward his employer, not his finances. Lee's counsel failed to object to questions about Lee's finances, failed to cite in his objections to other questions the prosecutorial misconduct alleged here, and failed to request a curative instruction or admonition. In short, he failed to preserve the issue for appeal.

In his reply brief, Lee argues belatedly that such a failure should be deemed ineffective assistance of counsel. " 'Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232.) Here, where no such good reason has been shown, we decline to consider Lee's claim of ineffective assistance of counsel. Thus, Lee has shown no reversible error in this respect.

## IV.

### *Sufficient Evidence Supports Counts 8 and 9.*

By convicting Lee of counts 8 (§ 550, subd. (a)(1)) and 9 (§ 550, subd. (b)(1)), a jury found beyond a reasonable doubt that Lee defrauded Progressive by availing himself of a rental car under false pretenses. On the instant appeal, Lee argues that there is insufficient evidence to support that verdict.

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—

18

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Subdivision (a)(1) of section 550 proscribes the knowing presentation of "any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance." Subdivision (b)(1) of the same statute forbids the presentation of "any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact."

Here, the People's evidence was sufficient to show that Lee violated those two statutory provisions. At trial, Progressive claim representative Loan Craig testified that in October 2014, she was assigned to process the insurance claim Lee made for scratch damage to his Porsche. According to Craig, Lee e-mailed her after Progressive wrote Lee a check for the scratch damage, stating that he planned to bring the Porsche to an auto shop and asking to arrange a car rental for the duration of the repairs. Lee then told Craig that he was in Colorado where he was having the Porsche repaired and would need a larger rental car to accommodate visiting relatives. Based on those representations, Progressive ultimately paid $720 to furnish Lee with a rental car for 18 days.

Under the terms of Lee's insurance policy, such a benefit was authorized only on the condition that his Porsche was at the auto shop. However, photographs taken after the rental car was returned showed that the scratch damage to Lee's Porsche was never repaired. Moreover, Lee admitted at trial that he lied to Craig when he told her he was "in Colorado right now[,] dropping" off the Porsche. From this testimony, a reasonable

trier of fact could conclude that neither Lee nor anyone else ever took the Porsche to the auto shop. It would follow that Lee's claim for the rental car benefit was fraudulent under section 550, subdivision (a)(1), and that Lee misled Craig as to a material fact under section 550, subdivision (b)(1), causing Craig to believe erroneously that the Porsche was being taken to the auto shop for repairs. Substantial evidence thus supports the verdict.

In support of his argument to the contrary, Lee cites his own testimony as well as the testimony of Colorado auto shop owner John May. Although he told Craig he was in Colorado dropping off the Porsche, Lee testified at trial that he had a friend take the Porsche to the shop in Colorado. May testified that he received the Porsche and tried unsuccessfully to wet-sand away the scratch damage, ultimately leaving the Porsche unrepaired because he had no time to perform further work. Lee was not charged for the wet-sanding, and May kept no records of the Porsche's purported presence in his shop.

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Accordingly, we do not resolve the apparent conflict between the testimony of Lee and May, on one hand, and the People's evidence suggesting that the Porsche was never taken in for repairs, on the other. The jury resolved that conflict in favor of the People's evidence and that resolution will not be disturbed on appeal.

In sum, substantial evidence supports the verdict as to counts 8 and 9.

## V.

### *There Was No Cumulative Error.*

Lee's final argument concerning the judgment of conviction alleges cumulative error, whereby the "combined effect of [multiple] errors substantially impaired his constitutional right to a fair trial." (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  Here, where we have found no reversible error and, for the most part, have concluded there was no error at all,[5] no question of cumulative error can arise.

## VI.

### *There Was No Abuse of Discretion in the Trial Court's Order for Restitution.*

As part of the restitution order entered after Lee's conviction, he was ordered to repay Homesite the $18,000 it had paid him to settle the fraudulent theft claim against Lee's renter's insurance policy.  In addition, Lee was ordered to pay Homesite $64,280.03 in attorney fees.  Lee argues the restitution order's inclusion of attorney fees is barred for two reasons.  He contends the terms of an intervening civil settlement between him and Homesite barred the court from ordering him to provide Homesite any further recovery and, in the alternative, that the fees were not "reasonable . . . costs of collection" within the meaning of the restitution statute. (§ 1202.4, subd. (f)(3)(H).)  Reviewing the trial court's order for abuse of discretion, we are not persuaded by either argument. (*People v. Grandpierre* (2021) 66 Cal.App.5th 111, 115.)

---

[5] We have not reached the issue whether the prosecutor's cross-examination of Lee regarding his finances constituted error, having concluded that the defendant failed to preserve that claim of error.

21

**A. The Trial Court's Discretion to Order Restitution for Attorney Fees Was Unaffected by Lee's March 2018 Settlement with Homesite.**

In May 2015, Homesite settled Lee's theft claim for $18,000. Nearly three years later in March 2018, Lee agreed to pay Homesite $18,000 to settle any civil lawsuits related to the theft claim, with "each side to bear its own attorneys' fees and costs." According to Lee, the trial court should have "held [Homesite] to the terms" of that settlement agreement and declined to order restitution for attorney fees.

Section 1202.4, subdivision (f), provides in relevant part that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims . . . ." (See also *id.*, subd. (a)(1).) "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so . . . ." (*Id.*, subd. (c).) The restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (*Id.*, subd. (f)(3).) "Actual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim" are among the determined economic losses properly addressed by a restitution order. (*Id.*, subd. (f)(3)(H).)

In *People v. Grundfor* (2019) 39 Cal.App.5th 22, 25 (*Grundfor*), the Second District considered whether a trial court could order restitution for the attorney fees of a victim when a civil "settlement agreement the victim signed preclude[d] her recovery of attorney fees." The *Grundfor* court affirmed the restitution order, observing that a settlement with an insurance company "and the state's right to compel [a defendant] to pay restitution

22

operate independently of each another." (*Id*. at p. 28.) The former may relieve a party "from further *civil* liability," but it does "not relieve him from paying *criminal* restitution." (*Ibid*.) Thus, the March 2018 settlement agreement here released Lee from civil liability as to the fees charged by Homesite's attorneys, but it did not bar the state from ordering Lee to pay restitution for those fees.

Lee urges us to read *Grundfor* narrowly to apply only where—as in *Grundfor*—the victim received only a partial settlement for the injury caused by the defendant's criminal conduct. But there is no such limitation in the categorical distinction *Grundfor* draws between the civil law of contract, on one hand, and the constitutional and criminal restitution scheme, on the other. (*Grundfor, supra,* 39 Cal.App.5th at p. 28.) As for Lee's appeal to the state's public policy interest in enforcing the terms of settlement agreements, it will suffice to note that the state has an even greater interest in preventing contracts which "exempt any one from responsibility for his own . . . violation of law." (Civ. Code, § 1668.) Here, where Lee's conduct violated the criminal law, he cannot contract away his criminal liability.

**B. The Attorney Fees Were Reasonable Costs of Collection.**

Section 1202.4, subdivision (f)(3)(H), authorizes restitution for "reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim." Citing this authority, Lee argues that any attorney fees billed after the March 2018 settlement agreement were unreasonable because "Homesite had no reason to involve itself in the criminal case."

Not so. At the time the restitution order was entered on December 20, 2019, Lee had still not paid Homesite the $18,000 he owed under the March 2018 settlement agreement. And a restitution order is " 'enforceable as a civil judgment.' " (*People v. Guardado* (1995) 40 Cal.App.4th 757, 762.)

23

Thus, by aiding the prosecution of Lee's criminal case, Homesite's attorneys helped to secure a conviction and in turn, a restitution order having the same effect as a civil judgment.  By virtue of those efforts, Homesite's attorneys put Homesite in a better position to collect the $18,000 it was already owed.  For that reason, their fees were "reasonable . . . costs of collection" under section 1202.4, subdivision (f)(3)(H).

In sum, the trial court did not abuse its discretion in ordering Lee to pay restitution for the attorney fees incurred by Homesite.

## DISPOSITION

We affirm both the judgment and the restitution order in their entirety.

_____
STEWART, Acting P.J.

We concur:


_____
MILLER, J.


_____
MAYFIELD, J.*


*People v. Lee* (A158225, A159872)

_____

    * Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25