Filed 4/14/25  P. v. Juarez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE MATTHEW JUAREZ,<br><br>    Defendant and Appellant.</td><td>H051410<br>(Santa Cruz County<br> Super. Ct. No. 22CR04422)</td></tr>
</table>

Defendant Jose Matthew Juarez was convicted by plea of one count of carrying a loaded unregistered firearm on his person and in a vehicle (Pen. Code,[1] § 25850, subds. (a), (c)(6)).  Juarez contends that his conviction should be reversed on two grounds: (1) the trial court erred in denying his motion to suppress the evidence of the firearm; and (2) section 25850 is unconstitutional under *New York State Rifle & Pistol Assn. Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  In addition, Juarez argues that the trial court violated his equal protection rights by denying section 4019 credits for custodial time served on private electronic monitoring.

For the reasons stated below, we disagree and affirm the judgment.

---

[1] All further unspecified statutory references are to the Penal Code.

# I. FACTS AND PROCEDURAL BACKGROUND

## A. *Facts and Charges*[2]

Christopher Jones was a sergeant with the Santa Cruz County Sheriff's Office. While on duty the evening of October 2, 2022, about 10:18 p.m., he was asked to respond to a citizen complaint about a possible suicide attempt near a vehicle on the Mar Monte overpass on Highway 1.

As Sergeant Jones approached the overpass, he saw a red sedan parked on the shoulder, with two men standing outside towards the back of the car. The vehicle was parked facing westbound on the overpass's shoulder, which was a small shoulder lane without space for parking for nonemergency purposes. The overpass was a "highly unusual" place to park, and it raised in Jones's mind concerns about suicide and the risk of getting hit by another vehicle. Although Jones did not think a crime was occurring, he believed the men had parked illegally on the overpass, particularly because the vehicle "was parked over the fog line."

As Sergeant Jones approached the men, it did not appear to him that they were trying to jump off the overpass, but he was not sure why they were there. Jones intended to identify the men and determine why they were illegally parked on the overpass. It did not seem to Jones that the men had a reason for being there. Their location concerned him because it was "not a typical place where people loiter," and it was too small for a vehicle or pedestrians and it created a hazard.

Sergeant Jones found his initial interaction with the two men "strange," noting that, when he first arrived on the scene, both men "immediately started walking back towards the vehicle as if they were going [to] get into it . . . without having any sort of dialogue or interaction." Jones asked Juarez to join him and the other man on the other

---

[2] Because Juarez entered a plea of no contest and the parties waived the preparation of a probation report, this factual background is based on the preliminary hearing, which served as the basis for Juarez's plea.

side of the vehicle. Juarez complied but seemed to be avoiding making eye contact with him.

As Juarez came around the vehicle, Sergeant Jones "immediately noticed there was a long . . . object at the right front pocket of his jacket," which was a "windbreaker" style that allowed "anything heavy in the pocket . . . [to] stand out, which it did." The object was "clearly delineated" and visible in the video from Jones's body-worn camera. Testifying based on the video, Jones noticed the object in Juarez's pocket around 27 seconds from the beginning of the encounter. Based on his training and experience, Jones had seen objects that looked like the one in Juarez's pocket that "turn[ed] out to be weapons." He did not know, with "a mathematical certainty" that it was a gun in Juarez's pocket at the time; he only suspected it was a weapon. Jones observed that Juarez had an object similar to a water bottle that he was moving back and forth in front of his pocket, but Jones did not ask Juarez to keep his hands out of his pockets.

Sergeant Jones asked the men for their identification, called in their information, and told the men that he was going to conduct a warrant check. If it turned out the men had no warrants and had no weapon, Jones's plan was to "send them on the[ir] way." Once Jones noticed the object in Juarez's pocket, he felt he first needed to clear the weapon because he "d[id]n't want to get shot."

Although Sergeant Jones did not "immediately solely focus on" the object in Juarez's pocket because he "was trying to determine who they were and what they were doing," he "intently focus[ed] [his] flashlight on th[e] item" in Juarez's pocket until he felt comfortable asking what the item was. Although Jones wanted to conduct a pat down search for weapons and had called for backup assistance, he did not yet have a second officer to help him.

Approximately three and one-half minutes into the incident, Sergeant Jones pat searched Juarez's pocket, found a loaded gun (which "returned non registered"), and handcuffed Juarez.

3

### B. *Procedural Background*

On October 14, 2022, the Santa Cruz County District Attorney filed a complaint charging Juarez with one count of carrying a loaded firearm that was not registered to him on his person and in a vehicle in violation of section 25850, subdivision (c)(6), and one count of carrying a concealed firearm that was not registered to him on his person in violation of section 25400, subdivision (a)(2). Juarez demurred to the complaint, arguing that California's firearm licensing scheme and, by extension, laws criminalizing firearm possession without a license (including section 25850), are facially unconstitutional under the United States Supreme Court's decision in *Bruen*. The trial court overruled Juarez's demurrer, and Juarez entered a plea of not guilty to both counts.

On November 30, 2022, Juarez filed a motion to suppress the firearm. (§ 1538.5.) On February 15, 2023,[3] the trial court conducted a combined preliminary hearing and a hearing on the motion to suppress. The sole witness at the hearing was Sergeant Jones. The court viewed the first four minutes and seven seconds of the footage from Jones's body-worn camera, around the time when Jones discovered the firearm in Juarez's pocket. The court requested that the parties submit supplemental briefing on the following issues: "when the detention started, whether it was unduly prolonged," and "the standard for searching someone who an officer suspects is armed." The court held Juarez to answer, finding sufficient evidence to support the charges, subject to the motion to suppress and the admissibility of the evidence. Defense counsel and the district attorney briefed the issues identified by the court.

On February 27, the district attorney filed an information charging Juarez with one count of carrying a loaded unregistered firearm on his person and in a vehicle (§ 25850, subds. (a), (c)(6)) and one count of carrying a concealed firearm on his person (§ 25400, subd. (a)(2)).

---

[3] Unless otherwise indicated, all dates were in 2023.

4

On April 7, the trial court conducted a further hearing on the motion to suppress. Juarez's trial counsel argued Sergeant Jones's account of the evening lacked credibility and urged the court to reject Jones's assertion that he had reason to detain and pat down Juarez. Juarez's trial counsel argued that, because Jones did not require Juarez and the driver to sit down and show their hands and Juarez was "allowed to put his hands in and around his pockets," the court should not find credible Jones's claim that he saw the "gun under [] Juarez'[s] clothing and simply didn't take any action until" later. The district attorney responded that there was a Vehicle Code violation as a result of the two men parking illegally on the overpass, and that Jones testified "repeatedly" that he "immediately noticed the weapon" but chose not to "immediately deal with" it because "he wanted to be more casual about it."

After hearing argument, the trial court found there was a detention when Sergeant Jones arrived on the scene; Jones had "reasonable cause to detain"; he lawfully detained Juarez based on the illegally parked vehicle on the overpass; and Jones "present[ed] specific and articulable facts to justify the pat search," which he effectuated within "a few minutes." The court denied the motion to suppress the gun. Juarez entered a plea of not guilty to both counts of the information.

On June 5, Juarez filed a motion to dismiss both charged counts under section 995 on the ground that the evidence supporting the charges was illegally obtained. The district attorney opposed Juarez's motion. Both parties relied on arguments made in the earlier motion.

On August 7, the trial court heard the motion to dismiss. The court reviewed Sergeant Jones's bodycam video and testimony and found that the video evidence and Jones's testimony both indicated that Jones "saw what looked like a weapon within . . . 27 seconds." The court observed that Jones "kept his flashlight pretty much right on the spot of [Juarez's] jacket . . . where that weapon appears to be," and noted that Jones had also testified to doing so for the purpose of "[e]nsur[ing] officer safety while he

5

didn't have backup." The court stated that the foregoing led it to find credible Jones's testimony regarding the timing of his suspicion that Juarez was concealing a weapon. The court denied Juarez's motion to dismiss.[4]

On September 15, Juarez pleaded no contest to count one (carrying a loaded unregistered firearm on his person and in a vehicle (§ 25850, subds. (a), (c)(6)). The district attorney stated that Juarez would not be eligible for the Custody Alternatives Program (CAPS) because his conviction involved possession of a gun. The trial court suspended imposition of Juarez's sentence and ordered him to serve 120 days in jail, awarded him one day of custody credit, and authorized Juarez to complete the balance "on electronic monitoring like LCA [Leaders in Community Alternatives] or Options." Over defense counsel's objection, the court did not authorize any section 4019 credits for the time Juarez would serve on electronic monitoring. The court dismissed the remaining count.

Juarez timely filed a notice of appeal, stating the appeal was based on: (1) postplea matters that did not affect the validity of the plea under California Rules of Court, rule 8.304(b); (2) the denial of a motion to suppress evidence (§ 1538.5); and (3) the denial of section 4019 credits on private monitoring. Juarez did not request a certificate of probable cause.[5]

---

[4] Juarez does not challenge on appeal the order denying his motion to dismiss.

[5] On January 2, 2025, Juarez applied in this court for relief from default for leave to file an amended notice of appeal which includes a statement and request for certificate of probable cause. The Attorney General did not oppose Juarez's application. On February 4, 2025, this court filed an order granting Juarez's application, giving him 15 days to file the amended notice of appeal, and directing the trial court to rule on Juarez's request for certificate of probable cause. On February 19, 2025, this court received a copy of Juarez's application to the trial court to file an amended notice of appeal and request for certificate of probable cause. On February 25, 2025, the trial court filed Juarez's amended notice of appeal and granted his request for certificate of probable cause.

## II. DISCUSSION

Juarez argues the trial court erred in denying his motion to suppress because the firearm was discovered in the course of an unlawful detention. He also asserts that his conviction violates the Second Amendment because California's firearm licensing scheme at the time of his arrest was both unconstitutional on its face due to its inclusion of the " 'good cause' " and firearms training requirements, and as applied to him. In addition, Juarez contends that the trial court violated his equal protection rights by denying him section 4019 credits. He maintains that "Options," the privately operated home detention program in which he participated, meets the minimum statutory requirements for home detention pursuant to section 1203.016, and, thus, he should be awarded credits on an equal basis with participants in the county "CAPS program." The Attorney General disagrees on all points and requests that this court affirm the judgment.

A. *The Trial Court did not Err in Denying the Motion to Suppress*

1. <u>Legal Principles</u>

"A defendant may move to suppress evidence under section 1538.5 on grounds that a search without a warrant was unreasonable. A warrantless search is presumptively unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search." (*People v. Simon* (2016) 1 Cal.5th 98, 120 (*Simon*).)

" 'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.' " (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212.) The Fourth Amendment to the United States Constitution " 'prohibits *unreasonable* searches and seizures' " (*ibid.*) and our state Constitution has a similar provision. (Cal. Const., art. I, § 13.)

Traffic stops are considered " 'investigatory detentions.' " (*People v. Greenwood* (2010) 189 Cal.App.4th 742, 746.) " ' "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective

7

manifestation that the person detained may be involved in criminal activity." ' " (*Ibid.*)
"[T]he circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity.  Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so:  the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question."  (*In re Tony C.* (1978) 21 Cal.3d 888, 893 (*Tony C.*); see also *Terry v. Ohio* (1968) 392 U.S. 1, 21 (*Terry*).)

The Fourth Amendment standard " ' "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  [Citation.]  Courts "cannot reasonably demand scientific certainty . . . where none exists."  [Citation.]  Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." ' " (*People v. Flores* (2024) 15 Cal.5th 1032, 1041 (*Flores*).)  However, "officers are not entitled to rely on mere hunches" (*People v. Hernandez* (2008) 45 Cal.4th 295, 299) but instead must point to "articulable facts" (*ibid.*) and "particularized suspicion" (*id*. at p. 301) that the defendant "may have been acting illegally."  (*Id*. at p. 299.)

Although there may be a harmless explanation for the observed conduct, an officer may still investigate for the purpose of "resolv[ing] that very ambiguity and establish[ing] whether the activity is in fact legal or illegal to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' " (*Tony C.*, *supra*, 21 Cal.3d at p. 894; see also *People v. Leyba* (1981) 29 Cal.3d 591, 599.)

"[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the

8

persons with whom he is dealing may be armed and presently dangerous, . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." (*Terry*, *supra*, 392 U.S. at pp. 30–31.)  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [their] safety or that of others was in danger." (*Id*. at p. 27.) "Whether an officer's conduct was reasonable is evaluated on a case-by-case basis in light of the totality of the circumstances." (*In re Raymond C.* (2008) 45 Cal.4th 303, 307.)

When "reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*Simon*, *supra*, 1 Cal.5th at p. 120.)  "In doing so we do not consider each fact in isolation.  Instead, 'we must consider "the totality of the circumstances—the whole picture." ' " (*Flores*, *supra*, 15 Cal.5th at p. 1043.)  "If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

We "independently appl[y] the law to the trial court's factual findings, determining de novo whether the findings support the trial court's ruling." (*Gardner v. Appellate Division of Superior Court* (2019) 6 Cal.5th 998, 1006.)

      2.  <u>Analysis</u>

Juarez argues that Sergeant Jones lacked justification to detain him because (1) Jones responded to the overpass to investigate a report of a potential suicide attempt,

which "was almost immediately resolved"; (2) Jones's testimony that he was there to investigate a parking violation was not credible because he did not request a driver's license and registration,[6] issue a parking citation, or request that the men move the vehicle; and (3) Jones detained the men merely because he thought their behavior " 'odd.' "

It is true that Sergeant Jones determined when he approached the scene that Juarez and the other man did not appear to be attempting to jump off the overpass. However, Jones testified to his belief that the men had illegally parked on the overpass, since they were "parked over the fog line." He observed that the overpass was a "highly unusual" place to park and loiter, which created a hazardous situation. In addition, Jones discerned the men's "strange" behavior and that Juarez appeared to be "trying to avoid making [eye] contact with" him.

Taken together, these facts provide reasonable, articulable suspicion that Juarez and the other man had violated the Vehicle Code, that criminal activity might be "about to occur," and that Juarez was involved. (*Tony C.*, *supra*, 21 Cal.3d at p. 893.) Moreover, under the Fourth Amendment, Sergeant Jones reasonably stopped Juarez and the other man for their suspected violation of the Vehicle Code. (*People v. Bennett* (2011) 197 Cal.App.4th 907, 917; *Whren v. U.S.* (1996) 517 U.S. 806, 810 ["As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."]; see also Veh. Code, § 22500, subd. (k) [prohibition against stopping, parking, or leaving standing any vehicle "[u]pon a bridge"].) We determine that the trial court did not err in finding that Sergeant Jones had "reasonable cause to detain" Juarez on the basis of the illegally parked vehicle.

---

[6] Contrary to Juarez's argument, the record indicates that Sergeant Jones did ask for the men's identification and the driver provided his driver's license, but Juarez only identified himself verbally.

Juarez also argues that Sergeant Jones unduly prolonged the detention beyond what was reasonable because, "once [Jones] was satisfied that no suicide was planned, his original reason for the investigation had been fulfilled." As discussed *ante*, we are not persuaded by Juarez's argument in light of the Vehicle Code violation and unusual circumstances of the incident. Moreover, once Juarez came around the vehicle, Jones "immediately noticed there was a long . . . object" in Juarez's jacket pocket, which, based on his experience, Jones surmised could be a weapon. Jones "intently focus[ed] [his] flashlight on th[e] item" until he felt he could safely conduct a pat down search, and he requested backup assistance.

The trial court found credible Sergeant Jones's testimony about how quickly he spotted the potential weapon, which was supported by evidence from the body-worn camera footage showing Jones training his flashlight beam on the area in Juarez's jacket pocket "where [the] weapon appear[ed] to be" approximately 27 seconds into the encounter. Jones conducted a pat search of Juarez's pocket approximately three and one-half minutes into the encounter and discovered the unregistered, loaded firearm. The court found that Jones offered "specific and articulable facts to justify the pat search" and conducted the search within "a few minutes."

Although "[a]n investigatory stop exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible[,] . . . [c]ircumstances which develop during a detention may provide reasonable suspicion to prolong the detention." (*People v. Russell* (2000) 81 Cal.App.4th 96, 101–102.) Sergeant Jones initially detained Juarez and the driver to investigate a possible Vehicle Code violation, but when Jones detected a potential weapon in Juarez's jacket pocket soon after encountering the men, he reasonably prolonged their detention for the purpose of investigating the nature of the suspected weapon while engaging in actions meant to maintain his and others' safety. Thus, despite Juarez's assertion that Jones's timeframe within which to conduct an investigation ended once he discerned that

11

the two men were not attempting suicide, intervening observations provided reasonable justification for the continuation of the detention for the three to four minutes it took for Jones to investigate the possible Vehicle Code violation, identify the potential weapon, call in a warrant check on the two men, request assistance, and conduct a pat search of Juarez's jacket pocket. (*Id*. at p. 102.) Jones "had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so" (*Terry*, *supra*, 392 U.S. at p. 28), including confining the pat search to Juarez's jacket pocket. (*Id*. at p. 30 [noting search was reasonable where the officer "confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapon"].)

Considering the totality of the circumstances, we conclude that substantial evidence in the record supports the trial court's conclusion that Sergeant Jones had reasonable suspicion and had specific, articulable facts to justify (1) detaining Juarez to investigate his purpose for parking illegally on the overpass; and (2) once he noticed the possible weapon, detaining Juarez until he could safely conduct a pat search of his jacket pocket. The trial court did not err in denying Juarez's motion to suppress.

B. *Juarez's Conviction did not Violate the Second Amendment*

1. Legal Principles

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) States are subject to the Second Amendment pursuant to the due process clause of the Fourteenth Amendment. (*McDonald v. City of Chicago* (2010) 561 U.S. 742, 791.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court held that the rights granted by the Second Amendment include "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id*. at p. 635.) In its decision in *Bruen*, the United States Supreme Court extended its holding in

*Heller* to recognize "an individual's right to carry a handgun for self-defense outside the home." (*Bruen*, *supra*, 597 U.S. at p. 10.)

Bruen decided a Second Amendment challenge to New York's firearm licensing scheme brought by two New York residents who had separately applied for unrestricted licenses to carry handguns in public. They alleged they were denied such licenses on the grounds "that they had failed to show 'proper cause,' *i.e.*, had failed to demonstrate a unique need for self-defense." (*Bruen*, *supra*, 597 U.S. at p. 16.)

After engaging in a textual and historical analysis of New York's regulation of firearms, the United States Supreme Court found unconstitutional New York's requirement that gun license applicants establish "proper cause" to obtain an unrestricted license to carry handguns in public. (*Bruen*, *supra*, 597 U.S. p. 71.) The court concluded that the "proper-cause" requirement "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" (*ibid*.) by requiring them to "demonstrat[e] to government officers some special need" to bear arms. (*Id*. at p. 70.)

The United States Supreme Court articulated a "text and history" test for analyzing constitutional challenges based on rights granted by the Second Amendment. (*Bruen*, *supra*, 597 U.S. at p. 17.) "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Ibid*.)

Writing for the court and separately, justices in the *Bruen* majority reiterated that the Second Amendment does not protect a right to " 'keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " (*Bruen*, *supra*, 597 U.S. at p. 21 (maj. opn. of Thomas, J.); *id*. at pp. 80–81 (conc. opn. of Kavanaugh, J.),

citing *Heller*, *supra*, 554 U.S. at p. 626.) They cautioned that an individual's Second Amendment right remains "subject to certain reasonable, well-defined restrictions," (*Bruen*, at p. 70) including the "imposi[tion of] licensing requirements for carrying a handgun for self-defense" (*id*. at p. 79 (conc. opn. of Kavanaugh, J.)), such as "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." (*Id*. at p. 80 (conc. opn. of Kavanaugh, J.); see also *Heller*, at p. 627, fn. 26 [setting forth a non-exhaustive list of "presumptively lawful regulatory measures"].)

### a. Section 25850

Section 25850, subdivision (a) (section 25850(a)) provides that "[a] person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city, city and county, or in any public place or on any public street in a prohibited area of an unincorporated area of a county or city and county." Section 25850, subdivision (c)(6) sets forth the punishment for a violation of section 25850(a) by a person who has not registered the firearm.

"Although framed as a default prohibition, section 25850 is in effect the enforcement mechanism of a regulatory regime that grants licenses to those who may lawfully carry firearms and withholds licenses from those who may not." (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 915 (*T.F.-G.*).) On its own, section 25850 "appears broadly prohibitory, [but] it exists within a framework of numerous express exemptions." (*T.F.-G.*, at p. 908.) Among these exemptions is section 26010, which provides that section 25850 does not apply to individuals who have concealed carry permits issued pursuant to section 26150 et seq. (*T.F.-G.*, at p. 908.)

14

b. Firearm Licensing

Sections 26150 and 26155 set forth California's requirements for obtaining a license to carry a concealed firearm.[7]  At the time of Juarez's offense, former section 26150 required an applicant for a concealed carry license to meet four requirements: They must (1) be "of good moral character"; (2) provide "[g]ood cause [] for issuance of the license"; (3) be a resident of the county in which they are seeking the license; and (4) complete a firearms training course "as described in [s]ection 26165."  (Former § 26150, subd. (a), added by Stats. 2010, ch. 711, § 6, p. 4105 and amended by Stats. 2023, ch. 249, § 10, p. 4473, eff. Jan. 1, 2024 (former section 26150(a)).)  After the United States Supreme Court issued its decision in *Bruen*, the Legislature amended former section 26150(a) and, among other changes, removed the "[g]ood cause" requirement.[8]  (Stats. 2023, ch. 249, § 10, p. 4473.)

At the time of Juarez's offense, section 26165, former subdivision (a) required new license applicants to complete a training course that met all of the following criteria: (1) a course of a duration between eight and 16 hours; (2) instruction on firearm safety and handling, "shooting technique, and laws regarding the permissible use of a firearm"; and (3) "live-fire shooting exercises on a firing range" and "demonstration by the

---

[7] Section 26150 covers the issuance of concealed carry licenses by a county sheriff.  (§ 26150, subd. (a).)  Section 26155 covers the issuance of concealed carry licenses by the chief of police.  (§ 26155, subd. (a).)  Juarez focuses his claim of facial invalidity on former section 26150, and we limit our discussion to that provision.

[8] Effective January 1, 2024, pursuant to Senate Bill No. 2, the Legislature replaced the "good cause" requirement with a requirement that the applicant be and prove that they are at least 21 years of age; replaced the "good moral character" requirement with a requirement that the applicant meet the standards set forth in section 26202, which governs the designation of persons disqualified from obtaining a concealed-carry license; replaced the "may issue" language with "shall issue"; added guidance on the evidence needed to establish residency in the county; and added the requirement that the applicant be the registered owner of the firearm for which they are seeking the concealed-carry license.  (Stats. 2023, ch. 249, § 10, p. 4473.)

15

applicant of safe handling of, and shooting proficiency with, each firearm that the applicant is applying to be licensed to carry."**[9]**

" 'The interpretation of a statute and the determination of its constitutionality are questions of law.  In such cases, appellate courts apply a de novo standard of review.' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).)

" ' "A defendant challenging the constitutionality of a statute carries a heavy burden:  'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " '  [Citations.]  Typically, a litigant may challenge the constitutionality of a statute in two ways: on its face or as applied."  (*In re D.L.* (2023) 93 Cal.App.5th 144, 156 (*D.L.*).)

"A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the [statute] would be valid," *i.e.*, that the law is unconstitutional in all' " (*D.L.*, *supra*, 93 Cal.App.5th at p. 157; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [" ' "[P]etitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions[]" ' "]) or at least the " ' "great majority of cases" ' " (*T.F.-G.*, *supra*, 94 Cal.App.5th at p. 909, italics omitted).  When reviewing a facial challenge to a statute, we "consider[] only the text of the measure itself, not its application to the particular circumstances of an individual."  (*Tobe*, at p. 1084.)  In contrast, a defendant making an "as applied" challenge to a statute "seek[s] 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly

_____

**[9]** Following *Bruen*, the Legislature amended section 26165, subdivision (a) to lengthen the required duration of training, indicate the listed criteria were the minimum required, and add subjects to the required course, including a component on mental health.  (Stats. 2023, ch. 249, § 13, pp. 4474–4475.)  Juarez cites the post-*Bruen* version of section 26165 (which was not in effect at the time Juarez committed his offense) when he argues that the numerosity of the training requirements violates the Second Amendment.  We discuss his argument *post* (pt. II.C.2.a.).

16

impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied.' " (*D.L.*, at p. 157.)

" 'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact' " because an unconstitutional provision in a statute " 'does not necessarily defeat or affect the validity of its remaining provisions.' " (*Free Enterprise Fund v. Public Company Accounting Oversight Bd.* (2010) 561 U.S. 477, 508.) If only a portion of the statute is unconstitutional, and that portion is severable, courts will uphold the statute as constitutional. (*People v. Mosqueda* (2023) 97 Cal.App.5th 399, 414 (*Mosqueda*).)

When assessing whether an unconstitutional statutory provision is severable, if the statute does not contain a severability clause, we must determine whether the provision is " 'grammatically, functionally, and volitionally separable.[10]' " (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 271 (*Matosantos*).) Whether or not a provision is grammatically severable "depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." (*Ibid.*) Whether or not a provision is functionally severable depends on whether, after removal of the invalid provision, the remainder of the statute is " ' " 'complete in itself' " ' and 'capable of independent application.' " (*Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1358.) Whether or not a provision is volitionally severable "depends on whether the remainder [of the statute] ' "would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." ' " (*Matosantos*, at p. 271.)

---

**10** California case law appears to use the terms "severable" and "separable" interchangeably in this context.

2. <u>Analysis</u>

a. Former Section 26150

Juarez contends that former section 26150 is unconstitutional on its face because the *Bruen* decision rendered the statute's " 'good cause' " requirement unconstitutional. Moreover, Juarez asserts that because, when he was arrested, "[n]o California court had yet altered" the interpretation of the statute by declaring the " 'good cause' " requirement severable, the statute was still unconstitutional at that time. He additionally contends that, even with the " 'good cause' " requirement severed, California's licensing scheme remains unconstitutional because the training requirement "imposes so many conditions on the issuance of the license that it cannot be squared with *Bruen*."

The Attorney General concedes that the " 'good cause' " requirement of former section 26150 is unconstitutional following *Bruen*. As the statute contains no severability clause, we must consider whether the invalid provision is " 'grammatically, functionally, and volitionally separable' " from the remainder of the statute. (*Matosantos*, *supra*, 53 Cal.4th at p. 271.)

As it read at the time of Juarez's arrest, the "[g]ood cause" requirement in former section 26150(a) was both grammatically separate from the other license requirements set forth in subdivision (a) and set forth in its own subdivision, subdivision (a)(2). Removing the "[g]ood cause" requirement does not impair the wording or coherence of the remainder of the requirements in subdivision (a), and therefore this element is grammatically separable for purpose of the severance analysis.

With respect to functional severability, none of the other requirements are reliant upon or cross-reference the "good cause" requirement. Moreover, when the Legislature replaced former section 12050 with former section 26150, it "included the same general requirements for obtaining a license to carry a concealed weapon . . . without substantive change" but separated the requirements into "distinct paragraphs." (*D.L.*, *supra*, 93 Cal.App.5th at p. 164; see also Stats. 2010, ch. 711, § 6, p. 4105.) Not only are the other

18

licensing requirements independent and complete irrespective of the " 'good cause' " requirement (*D.L.*, at p. 163), "the Legislature viewed [them] as separate, and as functioning independently of one another." (*Id*. at p. 164.) Thus, the "good cause" requirement is functionally separable as well.

The crux of the third severability prong—volitional separability—"is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid." (*Matosantos*, *supra*, 53 Cal.4th at p. 273.) California courts have recognized the Legislature's interest in regulating firearms, particularly in controlling concealed firearms (*Nichols v. County of Santa Clara* (1990) 223 Cal.App.3d 1236, 1246), limiting firearms licenses to "law-abiding" citizens in line with *Heller* and *Bruen* (see, e.g., *Alexander*, *supra*, 91 Cal.App.5th at p. 479), and " 'ensuring Californians who carry firearms . . . know how to safely handle a gun' " (*Mosqueda*, *supra*, 97 Cal.App.5th at p. 414). We conclude that the Legislature would have preferred to excise the "good cause" requirement rather than eliminate the licensing scheme as a whole.

For these reasons, we decide the unconstitutional "good cause" requirement is severable from former section 26150. The remainder of former section 26150— including the training requirement Juarez challenges—is constitutionally sound post-*Bruen*. The only provision in New York's licensing framework the United States Supreme Court invalidated was the "proper cause" requirement. (*Bruen*, *supra*, 597 U.S. at p. 71.) Specifically, the court explained that " 'nothing' in its analysis should be interpreted to suggest the unconstitutionality of licensing regimes that require applicants to" meet objective criteria, such as " 'undergo[ing] a background check or pass[ing] a firearm safety course' to obtain a license." (*D.L.*, *supra*, 93 Cal.App.5th at p. 165, citing *Bruen*, at p. 38, fn. 9.)

At least two of former section 26150(a)'s other three licensing requirements at the time of Juarez's offense constitute objective requirements: Residence within the county

19

where the applicant seeks the license, and completion of a firearm training course.[11] The court in *Mosqueda* concluded that those requirements, together with the " 'good moral character' " requirement, "advance California's long-held goals of 'ensuring Californians who carry firearms are responsible and law-abiding, live in or have substantial contact with the licensing jurisdiction (since local law enforcement is tasked with licensee compliance) and know how to safely handle a gun.' " (*Mosqueda*, *supra*, 97 Cal.App.5th at p. 414.)

We conclude California's " 'good cause' " requirement is severable and, once severed, its licensing scheme under former section 26150 remains constitutionally valid. (*T.F.-G.*, *supra*, 94 Cal.App.5th at p. 916, citing *D.L.*, *supra*, 93 Cal.App.5th at pp. 163–165.)

Nevertheless, Juarez argues that, even if the "good cause" requirement is severable, such separation cannot be applied retroactively to overcome the unconstitutionality of his arrest for an offense that occurred before the California courts determined the requirement was severable. He relies on *Smith v. Cahoon* (1931) 283 U.S. 553 and *In re Porterfield* (1946) 28 Cal.2d 91 to support his argument. In *D.L.*, the defendant made a similar argument, alleging "that severability does not cure the harm suffered from his pre-*Bruen* conviction." (*D.L.*, *supra*, 93 Cal.App.5th at p. 165.) However, the court concluded that such an argument "could only make sense in the context of an 'as applied' challenge." (*Ibid.*) Both *Smith* and *Porterfield* are

---

[11] Juarez does not challenge, and we do not address, the constitutionality of former section 26150's "good moral character" requirement for licensure. Although the Legislature has replaced the "good moral character" requirement in section 26150 with a requirement that the applicant not be a "disqualified person" under section 26202 (Stats. 2023, ch. 249, § 10, p. 4473), the New York statute at issue in the *Bruen* case likewise included a " 'good moral character' " requirement, which the Supreme Court acknowledged but did not deem unconstitutional. (*Bruen*, *supra*, 597 U.S. at p. 11.) Notably, the Supreme Court distinguishes between licensing schemes that require a showing of "good cause" or "need" and those that include a "good moral character" or "suitability" requirement, treating the latter favorably. (See *id*. at p. 13, fn. 1.)

distinguishable as they involved "as applied" challenges to the applicable statutes, not facial challenges. (*Smith*, at p. 556; *Porterfield*, at p. 96.) Moreover, as the court in *D.L.* reasoned, even if the defendant could and did assert an as applied challenge, his conviction "had nothing to do with the 'good cause' licensing requirement." (*D.L.*, at p. 165.) We agree.

In addition, *Bruen* does not support Juarez's contention that the "many" training requirements in former section 26150 render it unconstitutional. *Bruen* and *Heller* both discuss our country's history of regulating the carrying of firearms and expressly state that their holdings do not limit a state's ability to continue to regulate firearms. Such regulations may include the imposition of firearms training courses. For example, in his majority opinion, Justice Thomas stated that "nothing" in the Court's analysis rendered unconstitutional objective criteria such as the requirement to "pass a firearms safety course, [which is] designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.' " (*Bruen*, *supra*, 597 U.S. at p. 38, fn. 9.) In addition, in his concurring opinion, Justice Kavanaugh stated that the shall-issue states' licensing statutes may continue to require the fulfillment of objective requirements such as "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements" (*Id.* at p. 80 (conc. opn. of Kavanaugh, J.)) and the may-issue state licensing regimes may also enforce licensing requirements "so long as those [s]tates employ objective licensing requirements like those used by the 43 shall-issue [s]tates." (*Ibid.*; see also *Heller*, *supra*, 554 U.S. at pp. 597, 619.) We reject Juarez's facial challenge to former section 26150.

### b. Section 25850

"Given our conclusion that the 'good cause' requirement from sections 26150 and 26155 is severable, California's firearm licensing framework—and the criminal penalties under section 25850—remain valid." (*D.L.*, *supra*, 93 Cal.App.5th at p. 165.) "If a state

may enforce a licensing regime, then a state may impose penalties for noncompliance." (*T.F.-G.*, *supra*, 94 Cal.App.5th at p. 915; see also *Mosqueda*, *supra*, 97 Cal.App.5th at p. 414 [noting that a defendant's "Second Amendment rights are not violated when the state enforces [its licensing requirements] criminally"].)  Section 25850 is one such enforcement mechanism.  (See *T.F.-G.*, at p. 915.)

The penalties section 25850 imposes on those who do not have a concealed carry license would apply not only to those "who are wrongfully denied licenses based on the unconstitutional good cause requirement, but [also] on individuals who cannot or do not obtain licenses due to constitutionally valid restrictions" set forth in section 26150, including the residency and firearms training requirements.  (*T.F.-G.*, *supra*, 94 Cal.App.5th at p. 916.)  A facial challenge to section 25850 "succeeds only where [the] statute is unconstitutional in all or at least the generality or great majority of cases" (*id.* at pp. 915–916), so "it is not enough to show that [the] statute may have an unconstitutional application to a hypothetical person lawfully carrying" a loaded firearm on their person and/or in their vehicle "after failing to secure a license [to do so] due to [the] 'good cause' requirement."[12]  (*Id.* at p. 915; see also *Alexander*, *supra*, 91 Cal.App.5th at p. 474 [noting that, when "analyzing a facial challenge to the constitutionality of a statute," the reviewing court does not consider " 'its application to the particular circumstances of an individual' "].)  Section 25850 could still have been constitutionally applied to applicants

---

[12] Juarez argues for the first time on appeal that section 25850 is unconstitutional as applied to him.  "Because an as-applied challenge asserts a 'constitutional defense [that] may be correctable only by examining factual findings in the record or remanding to the trial court for further findings' [citation], it is not appropriately raised for the first time on appeal." (*Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1144; *People v. Patton* (2019) 41 Cal.App.5th 934, 946 ["An as-applied constitutional challenge is forfeited unless previously raised."].)  Therefore, we decline to consider Juarez's as-applied challenge to section 25850.  (*People v. Anderson* (2024) 104 Cal.App.5th 577, 584, fn. 1.)

who failed to secure a license due to the residency and/or firearms training requirements, and Juarez does not claim otherwise.

We therefore conclude Juarez's conviction does not violate the Second Amendment.

### C. Juarez Has not Demonstrated a Violation of his Right to Equal Protection

#### 1. Legal Principles

" '[E]qual protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' [Citation.] 'In other words, the legislation survives constitutional scrutiny as long as there is " 'any reasonably conceivable state of facts that could provide a rational basis for the classification.' " [Citation.] This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated.' " (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1090.)

"Since 1976, Penal Code section 4019 has offered prisoners in local custody the opportunity to earn 'conduct credit' against their sentences for good behavior. Conduct credits encourage prisoners to conform to prison regulations, to refrain from criminal and assaultive conduct, and to participate in work and other rehabilitative activities." (*People v. Brown* (2012) 54 Cal.4th 314, 317, fn. omitted; *People v. Orellana* (2022) 74 Cal.App.5th 319, 324, fn. 4.)

Section 4019 applies to prisoners who participate in a home detention program, subject to certain conditions. (§§ 4019, subd. (a)(7), 1203.016, subd. (b).) Section 1203.016, subdivision (i)(1) authorizes the correctional administrator, with board of supervisor approval, to "administer a home detention program pursuant to written contracts with appropriate public or private agencies or entities." Privately operated home detention programs must agree to operate in compliance with all applicable state laws and standards, demonstrate financial responsibility, and submit to an annual

23

compliance review by the correctional administrator. (*Id.*, subd. (i)(3)(B)(i), (iii), (iv).) To participate in a home detention program, an individual must comply with the program's rules and regulations, including "admit[ting] any probation officer or other peace officer designated by the correctional administrator into the participant's residence at any time for purposes of verifying the participant's compliance with the conditions of the detention." (*Id.*, subd. (b)(2).) If a peace officer supervising a participant in a home detention program "has reasonable cause to believe that the participant is not complying with the rules or conditions of the program . . . the peace officer may, . . . without a warrant of arrest, retake the person into custody to complete the remainder of the original sentence." (*Id.*, subd. (c).) "[U]nauthorized departures from the place of home detention" and "[w]illful failure" of the participant to return to home detention at prescribed times are punishable as escapes under section 4532. (*Id.*, subd. (f).)

Because Juarez's claim on appeal involves the interpretation of a statutory claim and an alleged equal protection violation, we review it de novo. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208 [equal protection claims]; *People v. Brewer* (2011) 192 Cal.App.4th 457, 461 [statutory interpretation].)

2. Analysis

Juarez contends that the Options home detention program satisfies the minimum statutory requirements set forth in section 1203.016, subdivision (b). According to Juarez, as an Options program participant, he and participants in the Santa Cruz Sheriff Office's CAPS program are similarly situated and equally entitled to conduct credits under section 4019.

While section 1203.016 allows correctional administrators to engage with private agencies or entities to provide home detention services, the record does not demonstrate, and Juarez does not argue, that a written contract exists between Options and the Santa Cruz County administrator, as expressly required under section 1203.016, subdivision (i)(1).

Juarez relies on comparisons between Options and CAPS's respective enrollment forms to demonstrate their alleged equivalency. He filed in this court a request for judicial notice of copies of these enrollment forms. However, Juarez acknowledges, and the Attorney General confirms, that neither document appeared in the record before the trial court nor in the record before us on appeal. Because the enrollment forms were not presented to the trial court, they are not appropriate for consideration on appeal. (*People v. Gallardo* (2024) 105 Cal.App.5th 296, 303, fn. 3 [declining to take judicial notice where the record on appeal "does not indicate the trial court reviewed or took judicial notice" of the proffered documents]; *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307 ["Documents not presented in the trial proceeding generally cannot be included as part of the record on appeal and must be disregarded on appeal as beyond the scope of review."]; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "].) Juarez has not presented any exceptional circumstances here that would justify deviation from that general principle (*Vons*, at p. 444, fn. 3), and we deny Juarez's request for judicial notice.

Because Juarez fails to support his arguments with citations to admitted evidence in the record, we conclude Juarez cannot prevail on his equal protection challenge to the trial court's decision to deny Juarez section 4019 credits for the time he served on the Options electronic monitoring program.

### III. DISPOSITION

The judgment is affirmed.

_____
Danner, Acting P. J.

WE CONCUR:


_____
Lie, J.



_____
Bromberg, J.




**H051410**
***People v. Juarez***